UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CODY ZIPARO,

                              Plaintiff,
                                                    5:17-CV-0708
v.                                                  (GTS/TWD)

CSX TRANSPORTATION, INC.,

                              Defendant.
_____

APPEARANCES:                                OF COUNSEL:

BERMAN, SOBIN, GROSS, FELDMAN &             HANS D. LEIBENSPERGER, ESQ.
DARBY, LLP                                  PERRY M. DARBY, ESQ.
   Counsel for Plaintiff
1301 York Road, Suite 600
Lutherville, MD 21093

POWERS & SANTOLA, LLP                       DANIEL R. SANTOLA, ESQ.
   Co-counsel for Plaintiff
100 Great Oaks Blvd, Suite 123
Albany, NY 12203

NIXON PEABODY LLP                           SUSAN C. RONEY, ESQ.
   Counsel for Defendant
40 Fountain Plaza, Suite 500
Buffalo, NY 14202

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment retaliation action pursuant to the

whistleblower provision of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §§ 20109, filed

by Cody Ziparo ("Plaintiff") against CSX Transportation, Inc. ("CSX" or "Defendant"), are the

following two motions: (1) Defendant's motion for summary judgment pursuant to Fed. R. Civ.

P. 56; and (2) Defendant's motion to exclude the testimony of Plaintiff's expert witness at trial. (Dkt. Nos. 40, 41.)  For the reasons set forth below, Defendant's motion for summary judgment is granted and Defendant's motion to exclude expert testimony at trial is denied as moot.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Generally, in his Complaint, Plaintiff asserts a claim that Defendant violated the whistleblower provision of FRSA by subjecting him to various adverse actions (including threats of discipline, greater scrutiny, and ultimately termination) in retaliation for making complaints about his supervisors' orders to falsify information.  (Dkt. No. 1 [Pl.'s Compl.].)  More specifically, Plaintiff alleges that his supervisors ordered him to input incorrect information regarding departure time, arrival time, and the completeness of his work into Defendant's onboard electronic system in order to improve their chances of bonuses, and that his supervisors engaged in a pattern of retaliation against him after he made an internal ethics complaint about their orders that ultimately ended in the termination of his employment.  (*Id.*)

### B. Undisputed Material Facts on Defendant's Motion for Summary Judgment

Unless otherwise stated, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and either expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations.[1]  (*Compare* Dkt.

---

[1]    In determining the undisputed nature of Defendant's Statement of Material Facts, the Court has, out of special solicitude to Plaintiff, considered the citations contained in his denials even though those citations are not "to the record" as required by Local Rule 7.1(a)(3), but to various paragraphs of his Statement of Additional Material Facts in Dispute (which contain, often in support of unresponsive assertions, citations to the record).  The Court has also considered the other paragraphs of Plaintiff's Statement of Additional Material Facts in Dispute and Defendant's response thereto.  (*Compare* Dkt. No. 50, Attach. 28, at 17-56 [Pl.'s Statement

No. 40, Attach. 37 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 50, Attach. 28 [Pl.'s Rule 7.1 Resp.].)

## Background[2]

1.      Plaintiff was employed by Defendant as a train conductor from 2006 to 2016 and primarily worked in the Watertown rail yard with runs between facilities in DeWitt and Massena.

2.      The duties of a train conductor include building trains, switching cars at customers' facilities, and helping to ensure safe railroad operations.

3.      A conductor's duties include switching railcars (i.e, moving and arranging individual railcars into trains depending on their respective destinations), a process that includes moving the individual railcars by locomotive into trains on parallel tracks and, at certain points, "cutting" (detaching) the individual railcars from the locomotive moving them.

4.      Plaintiff's supervisors in 2015 and 2016 included trainmasters Ryan Van Blarcom and Jimmy Lacy.

5.      A trainmaster is responsible for overseeing the work of employees and making sure customers' needs are met in his or her assigned territory, and for assuring that work is performed safely and in compliance with applicable federal and company rules.

---

of Additional Material Facts] *with* Dkt. No. 54, Attach. 1, at 39, 79 [Def.'s Resp.].)  Generally, Plaintiff's Statement of Additional Material Facts in Dispute asserts facts that are immaterial and/or rely on record citations that are inaccurate or incomplete.

[2]      The Court notes that some of the exhibits cited or discussed in this Decision and Order, both in this Statement of Undisputed Material Facts and the Court's analysis, were placed under seal by previous Court Orders. (*See* Dkt. Nos. 42, 52, 56.)  However, the Court finds that the privacy interest in the specific material cited in this Decision and Order is not so great as to require redaction.  As a result, the Court has not redacted any information from this Decision and Order.

6.     Mr. Van Blarcom's territory as trainmaster included 60 to 70 freight customers.

7.     On occasion, Mr. Van Blarcom traveled from Massena to Watertown and Syracuse for various purposes, including to understand and discuss the logistics of day-to-day operations, to cover his territory, to ride trains, to have face-to-face interaction with employees, and to conduct operational rules testing (i.e., watching employees performing their duties to make sure those duties were being performed in accordance with Defendant's rules and federal regulations.[3]

8.     Over the course of his managerial career, Mr. Van Blarcom has employed the technique of asking employees to keep a log of their daily activities so he can spot patterns of issues that cause delays in rail service and know what needs to be fixed to ensure smoother operations.[4]

---

[3]     Plaintiff denies the portion of Defendant's asserted fact that Mr. Van Blarcom routinely made these trips two-to-three times per week, citing deposition testimony from Mr. Lacy, in which Mr. Lacy testified that Mr. Van Blarcom went to Watertown "once every couple of months." (*Compare* Dkt. No. 40, Attach. 37, at ¶ 7 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 50, Attach. 28, at ¶ 7 [Pl.'s Rule 7.1 Resp.].)  Given the dispute of fact as to how often Mr. Van Blarcom went to Watertown, that portion of the asserted fact has been omitted.  The Court notes, however, that, in addition to the testimony cited by Plaintiff, Mr. Lacy testified in the same response that the frequency of Mr. Van Blarcum's visits might have been "maybe once every month or so," but that he really did not know with any certainty, particularly because, at the relevant time, he and Mr. Van Blarcom were working opposite schedules (i.e., Mr. Lacy was on a night shift and Mr. Van Blarcom was on a day shift) such that they "very rarely, if at all" crossed paths in person.  (Dkt. No. 40, Attach. 11, at 11, dep. pp. 28-31 [Lacy Dep.].)

[4]     Plaintiff denies this asserted fact, citing to testimony from train engineer Christopher Pigula.  (*Compare* Dkt. No. 40, Attach. 37, at ¶ 8 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 50, Attach. 28, at ¶ 8 [Pl.'s Rule 7.1 Resp.].)  However, Mr. Pigula's testimony does not support that denial.  Although Mr. Pigula testified that Mr. Van Blarcom did not ask others in the Watertown yard to keep a log of their activities, the asserted fact relates to Mr. Van Blarcom's managerial career in general, not merely to his work with Watertown employees; Mr. Pigula also testified that Mr. Van Blarcom had instituted the use of a form for employees in Massena to fill out daily related to the basis for any delays, and that Mr. Van Blarcom later expanded that

9.      According to Plaintiff, the workload in the Watertown rail yard increased in early

2016.

10.     In his deposition, Mr. Van Blarcom testified that, in April 2016, because of

recurring issues affecting train service, he asked Plaintiff to keep a log of daily activities so that

he could determine what needed to be fixed and how they could do things better to improve

operations.[5]

11.     In his deposition, Mr. Lacy testified that he thought he may have given Plaintiff

his opinion that the reason for Mr. Van Blarcom's request for Plaintiff to keep a log of his daily

activities was to determine how to improve service to customers.[6]

---

practice of logging information to Watertown, but without the use of the form.  (Dkt. No. 40, Attach. 10, at 5-6, dep. pp. 53-55 [Pigula Dep.].)  Additionally, Mr. Van Blarcom testified that he had talked to train conductor William Miner about writing down the cause for any delays, and Mr. Miner testified at his deposition that he was asked to keep a log of his activities because "they wanted to see how long it takes to switch out cars in industries."  (Dkt. No. 40, Attach. 7, at 27, dep. pp. 114-15 [Van Blarcom Dep.]; Dkt. No. 40, Attach, 6, at 15, dep. pp. 51-53 [Miner Dep.].)  Because the evidence therefore does not support Plaintiff's stated denial, this asserted fact is deemed admitted.

[5]      Plaintiff denies this asserted fact, arguing that the real reason for this conduct was to retaliate against him for his protected activity.  (*Compare* Dkt. No. 40, Attach. 37, at ¶ 10 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 50, Attach. 28, at ¶ 10 [Pl.'s Rule 7.1 Resp.].)  As an initial matter, Plaintiff's citation to large swaths of his Statement of Additional Material Facts in Dispute does not comply with the requirement in the Local Rules to "set forth a specific citation to the record where the factual issue arises."  N.D.N.Y. L.R. 7.1(a)(3).  Additionally, nothing in the host of citations contained within those cited facts directly supports Plaintiff's denial.  Lastly, Plaintiff's denial is little more than legal argument rather than an attempt to controvert the stated fact.  Because Plaintiff has not cited admissible evidence to establish that the asserted reason was not the reason put forth at the time of the conduct in question, this fact is deemed admitted, with the minor change of specifying that this is what Mr. Van Blarcom testified, because that distinction has little materiality under the circumstances.

[6]      Plaintiff's denial of this asserted fact is inadequate for many of the reasons discussed above in note 4.  Additionally, Plaintiff does not appear to deny that this was a reason that Mr. Lacy told him for the action, nor does he cite any admissible evidence to contradict Mr.

12.     Mr. Miner had been asked to keep a log of his activities during the working day by a "couple" of trainmasters "throughout the years for the purpose of seeing "how long it took to switch out industries and cars."[7]

## Onboard Work Order Issue

13.     The Onboard Work Order ("OBWO") is a computer tablet-like device that conductors such as Plaintiff carry with them for the purpose of inputting certain data over the course of a shift.

14.     The data input into an employee's OBWO is relayed to Defendant's internal customer service center and is ultimately made available to customers.

15.     The data input into an employee's OBWO include information such as train departure and arrival times, cars that are placed at or pulled from customers' locations, and other data.

16.     The information input into an OBWO is used as a customer service measurement tool, so that customers are able to see what cars they are going to receive, when the train is departing, and when it will arrive.[8]

---

Lacy's testimony at his deposition as to this matter.  (Dkt. No. 50, Attach. 28, at ¶ 11 [Pl.'s Rule 7.1 Resp.].)  As a result, this asserted fact is deemed admitted.

[7]     Plaintiff denies this asserted fact, citing deposition testimony by Mr. Pigula, in which Mr. Pigula stated that Mr. Van Blarcom had not asked Mr. Miner to keep such a log. (Dkt. No. 50, Attach. 28, at ¶ 12 [Pl.'s Rule 7.1 Resp.].)  However, Mr. Miner's own testimony states that he was in fact asked to keep such a log, including while he was being supervised by Mr. Lacy around the time that Plaintiff was asked to keep his log.  (Dkt. No. 40, Attach. 6, at 15, dep. pp. 51-53 [Miner Dep.].)

[8]     Plaintiff's partial denial of this fact (on the purported ground that this was not the sole use of the information) is ineffective because the fact does not assert that this was the sole use of the information.  A response to a Statement of Material Facts is not the means by which to

17.     The OBWO is used as a customer-oriented device that enables customers to track their deliveries.[9]

18.     In this respect, Mr. Pigula likened the OBWO to FedEx's system for tracking the status and location of shipments.

19.     OBWOs are not safety equipment that is mandated by law; not all trains are equipped with OBWOs, and OBWOs are not required for the purpose of showing the location of railcars carrying hazardous materials.[10]

20.     To verify the location of railcars containing hazardous materials, train crews carry mandated paperwork, which is updated by hand to show the current position of each hazardous material shipment, as required by federal law.[11]

21.     Plaintiff claims that Mr. Van Blarcom and Mr. Lacy told him in early 2016 to enter inaccurate information, such as departure times, delivery times, idle times, work completed

---

dispute an arguably implied fact, but the means by which to dispute an expressly asserted fact. *Willis v. Cnty. of Onondaga*, 14-CV-1306, 2016 WL 7116126, at *2 n.1 (N.D.N.Y. Dec. 6, 2016) (Suddaby, C.J.), *aff'd*, 710 F. App'x 47 (2d Cir. 2018).

[9]     *See*, *supra*, note 7 of this Decision and Order.

[10]     Plaintiff denies this asserted fact, arguing that the truth of this fact depends on the definition of the word "required" used by Defendant. (Dkt. No. 50, Attach. 28, at ¶ 19 [Pl.'s Rule 7.1 Resp.].)  Based on the language of this asserted fact (and the record evidence cited in support of it), the Court finds that the only reasonable interpretation of the word "required" is "mandated by law." (Dkt. No. 40, Attach. 13, at 9-10, dep. pp. 32-33 [Ammons Dep.].)  As Mr. Ammons testified, conductors were required to carry appropriately updated physical paperwork containing information required by law related to the location of railcars carrying hazardous materials; Mr. Ammons further testified that the fact that the same information might also be input into the OBWO does not make the OBWO a piece of required safety equipment. (*Id.*) Because Plaintiff admitted that the OBWO itself is not mandated by law, this fact has been admitted.

[11]     Plaintiff's denial does not controvert the above-stated asserted fact.

and arrival times, into his OBWO to improve their customer service metrics for the purpose of enabling Mr. Van Blarcom and Mr. Lacy to receive performance-based bonuses.

22.    Plaintiff did not input inaccurate information in his OBWO because he felt that it would have constituted lying, that it was not right, and that it would affect customers, and because it made him uncomfortable.

23.    According to Mr. Lacy, being asked to input incorrect information into the OBWO is not something he considered distracting; it was "not something that could get you hurt or killed" and it was not a "life and death" situation.[12]

## The Handbrake Charge

24.    In April 2016, Defendant's Operating Rules required that handbrakes be applied and tested on railcars that were not attached to a locomotive and were "unattended."

25.    "Unattended" in relation to railcars means cars that are left standing and unmanned in such a manner that a conductor cannot readily control the handbrake on the car; although "unattended" does not specify a particular distance between an employee and a railcar, a railcar is "attended" only if an employee is in a position to see or hear movement and to be able to manipulate or operate the handbrake on the car manually or to otherwise take action if the car starts to roll or move.

26.    The purpose of the Operating Rules regarding securing unattended railcars and testing their handbrakes is to avoid having railcars moving inadvertently, derailing or striking

_____

[12]    Plaintiff denies this asserted fact, arguing that inputting incorrect information would be dangerous. (Dkt. No. 50, Attach. 28, at ¶ 23 [Pl.'s Rule 7.1 Resp.].) However, none of the cited evidence creates a dispute of fact as to whether the asserted fact was Mr. Lacy's testimony. As a result, this fact is deemed admitted.

equipment, or otherwise causing a catastrophic accident.

27.     In his deposition, Mr. Pigula testified that he was aware of instances in which CSX employees in the Albany division (other than himself and Plaintiff) had been disciplined for violating the operating rules relating to securing and performing handbrake tests on unattended railcars.[13]

28.     While at work on April 13, 2016, Mr. Van Blarcom discovered, on tracks near a highway, a set of 14 "cut away" (i.e., detached) railcars that had not been secured by handbrakes and for which no handbrake test had been performed.

29.     The 14 railcars discovered by Mr. Van Blarcom on April 13, 2016, were the responsibility of Plaintiff and Mr. Pigula.[14]

30.     At the time that Mr. Van Blarcom discovered the 14 railcars, Plaintiff and Mr. Pigula were performing a switching operation (during which both were riding a locomotive), putting them at approximately 1,000 feet away from the railcars.

31.     When Mr. Van Blarcom discovered the 14 railcars, Plaintiff and Mr. Pigula were "out of [his] sight" from his vantage point beside to the railcars.[15]

---

[13]     Plaintiff's partial denial of this fact (on the purported ground that disciplinary charges were less common than implied by this fact) is ineffective because the fact does not assert that the discipline in question was common.

[14]     Although evidence that Plaintiff was "attending" the 14 railcars in question does not mean that they were not "unsecured" by handbrakes, the Court has eliminated the word "unsecured" from the asserted fact because of the lack of materiality of the word in this assertion, given the prior undisputed material fact.

[15]     Plaintiff's denial of this fact (on the ground that he was purportedly "attending" the railcars at the time) is ineffective because it does not controvert what Mr. Van Blarcom saw or did not see.

32.     As a result of the incident of April 13, 2016, Plaintiff was charged with a rule violation.

33.     An on-property hearing was scheduled to provide Plaintiff with the chance to appear with union representation and contest the rule-violation charge, but Plaintiff opted not to attend the hearing and instead waived his contractual right to a formal investigation and accepted responsibility for the violation; for this admitted violation, Plaintiff agreed to receive a formal reprimand.

## Ethics Complaints

34.     At the beginning of May 2016, Plaintiff met with Mr. Lacy in Mr. Lacy's office related to inputting data into the OBWO.

35.     Plaintiff described Mr. Lacy as "frustrated" and "yelling" about the OBWO data input from the previous day, and Plaintiff testified that Mr. Lacy told him that he was supposed to be charged with and fired for insubordination.

36.     According to Mr. Lacy, this meeting was the first and only time that Plaintiff had characterized the OBWO data-entry issue as a purported safety issue, which Plaintiff did so only because he felt that the failure to follow instructions to fabricate the OBWO data caused him "undue stress."[16]

37.     In his deposition, Plaintiff admitted he was not charged with insubordination.[17]

---

[16]     Plaintiff denies this asserted fact, but has failed to provide admissible evidence to create a factual dispute as to whether this was Mr. Lacy's testimony.  (Dkt. No. 50, Attach. 28, at ¶ 36 [Pl.'s Rule 7.1 Resp.].)  This asserted fact is therefore deemed admitted.

[17]     Plaintiff admits he was not formally charged in writing with insubordination but asserts that he was "charged . . . orally with insubordination." (Dkt. No. 50, Attach. 28, at ¶ 37 [Pl.'s Rule 7.1 Resp.].)  However, the record evidence he cites does not support that assertion.

38.     Following the meeting with Mr. Lacy, Plaintiff decided to make a complaint with Defendant's internal ethics department.[18]

39.     Defendant has an "ethics hotline" through which employees can report what they perceive to be violations by calling a phone number specifically for that purpose.

40.     On May 3, 2016, Plaintiff called Defendant's ethics complaint hotline and reported that Mr. Van Blarcom and Mr. Lacy had asked him to falsify information on his OBWO related to train departure times and work completion, which he reported as "a safety issue because employees are not focused on their work and are preoccupied with the harassment"; he stated that he believed he was being asked to falsify this information to make the trainmasters' performance measurements look better.

41.     On May 5, 2016, Mr. Pigula called Defendant's ethics complaint hotline and reported that Mr. Van Blarcom and Mr. Lacy were instructing the crews to falsify information in their OBWOs "so that management does not take any hits," even though this falsification gave customers a false expectation of arrival time, that employees were threatened with insubordination if they did not follow these instructions, and that the workload had increased 113%; Mr. Pigula made no explicit mention of any safety issues.

42.     Plaintiff alleges in his Complaint in this action that he "made ethics complaints

---

[18]     The evidence cited by Defendant does not support Defendant's asserted fact insofar as it asserts that the complaint was filed "as a result of the meeting"; rather, the cited testimony by Plaintiff states that Mr. Lacy's conduct during that meeting was simply "the last straw," and that the fact that the conduct about which Plaintiff was concerned (i.e., telling him to falsify data on the OBWO) "wasn't stopping" made Plaintiff feel that "it was to the point where something needed to be documented."  (Dkt. No. 40, Attach. 5, at 4 and 9, dep. pp. 50-52,70-72 [Pl.'s Dep.].)  However, because it is undisputed that Plaintiff made his complaint following that meeting, the asserted fact has been deemed admitted with the above alteration.

regarding the conduct of Trainmasters Van Blarcom and Lacy in May 2016, telling CSX that the pressure of falsifying documents under threat of discharge was affecting his work and making him work unsafely. [Plaintiff] made everyone at the terminal aware of his safety concerns and ethics complaint, including Trainmaster Lacey." He was asked at his deposition how he raised the conduct of Mr. Van Blarcom and Mr. Lacy as a safety concern, and he did not say anything explicitly about hazardous material railcars in response to that question or at any other point in the deposition.

43.     At his deposition, Plaintiff testified about the reasons for his ethics complaint, which included being told to enter inaccurate data into his OBWO, the resulting "harassment" by Mr. Van Blarcom and Mr. Lacy when he refused to do so, the stress that harassment caused him, and the effect that the incorrect departure times had on customers' expectations as to when they would receive their railcars.

44.     Plaintiff alleges in his Complaint that "[t]he OSHA Whistleblower Office commenced its investigation, and [Plaintiff] fully cooperated with OSHA's investigation." When asked at his deposition about what he did to cooperate with the subsequent investigation of the Occupational Safety and Health Administration's ("OSHA"), he replied that he answered OSHA's questions "on the safety stuff and my whole report there," which was "basically your reiteration of the typed up report from ethics-point-dot-com." He did not say anything explicitly about hazardous material railcars in his reply to that question or at any other point in the deposition.

45.     This "typed up report from ethics-point-dot-com" memorializing Plaintiff's ethics complaint of May 3, 2016, does not state anything explicitly about hazardous material railcars.

46.     As a result of Plaintiff's and Mr. Pigula's ethics complaints, Defendant conducted an internal investigation.

47.     Mr. Van Blarcom acknowledged that he has asked Plaintiff to input information on the OBWOs that was factually incorrect.

48.     According to Mr. Lacy, Mr. Van Blarcom was not (to Mr. Lacy's knowledge) upset after Plaintiff made his ethics complaint; in fact, Mr. Lacy testified that he has never seen Mr. Van Blarcom upset and that Mr. Van Blarcom "always seemed to have a calm demeanor."[19]

49.     At his deposition, Mr. Lacy testified that he did not know if his superior, Jerry Lewandowski, had been told about Plaintiff's May 2016 ethics complaint.

50.     Mr. Lacy acknowledged that he has asked Plaintiff to input false information into the OBWO.

51.     In the late summer of 2016, Mr. Van Blarcom was issued a written reprimand as a result of the ethics investigation resulting from Plaintiff's and Mr. Pigula's ethics complaints.

52.     In late August 2016, Mr. Lacy was issued a written reprimand as a result of the ethics investigation resulting from Plaintiff's and Mr. Pigula's ethics complaints.

53.     At his deposition, Mr. Lacy testified that no one told him to "hit" the crews at the Watertown yard specifically with more operational test failures, although he did testify that he was told he needed to start documenting such failures across the board rather than simply

---

[19]     Although Plaintiff denies this asserted fact, he admits that this was, in fact, Mr. Lacy's testimony.  (Dkt. No. 50, Attach. 28, at ¶ 49 [Pl.'s Rule 7.1 Resp.].)  Additionally, although Plaintiff cites evidence purporting to show that Mr. Van Blarcom did not always have a calm demeanor, such evidence does not create a dispute as to the asserted fact, which is that Mr. Lacy testified as noted.  This asserted fact is deemed admitted.

informally addressing those failures with the crew members.[20]

**Misaligned Switch Incident and Plaintiff's Dismissal**

54.     On June 9, 2016, Plaintiff was responsible for a switching operation at an industrial customer's siding track near Gouverneur, New York, at mile marker QM 106.9 on the Saint Lawrence subdivision mainline.

55.     Plaintiff and his engineer, Mr. Pigula, removed empty railcars from the customer's siding to return to the Watertown yard and left loaded railcars for the customer on the siding.

56.     A switch is the mechanical device that enables the diversion of a train from the mainline tracks to a siding.

57.     The "normal" position for a switch at a siding is that which enables trains to continue to travel on the mainline.

58.     To move railcars onto or off of a siding, the conductor moves a switch into the position enabling diversion from the mainline onto the siding; a switch may be "lined" for the mainline or "lined" for the siding.

59.     A photograph labeled CSXT000285 and marked as "Exhibit G" at Plaintiff's deposition is a true and accurate depiction of the QM 106.9 switch facing north and connecting the mainline tracks to a siding on the left.

60.     A railcar-switching operation requires permission from the dispatcher for the crew to line the switch; the crew maintains radio contact with dispatch and records the time of the first

---

[20]     Plaintiff's denial of this fact is ineffective because it is based on merely an implication of the fact and, in any event, does not address the fact, which is limited to Mr. Lacy's deposition testimony.

and last movement of the switch.

61.     When the railcar-switching operation is completed, the conductor is required to restore the switch to the normal position. CSX Operating Rules 401.8 and 401.9 (which were in effect in June 2016) require employees to make certain that, after a switch is opened, the switch is properly lined and locked in the normal position for train movement along the mainline.

62.     CSX Operating Rule 401.13 (which was in effect in June 2016) requires switches to be restored to their normal position before movement is reported as "clear" to the train dispatcher or a signal to proceed is given to another train.

63.     If a switch is not normalized outside of switching operations, a mainline train traveling at full speed could inadvertently be diverted onto an industrial siding, colliding with standing cars, the results of which could be catastrophic.

64.     Crews involved in switching operations are required to complete a Switch Position Awareness Form confirming, inter alia, the time a switch is normalized at the conclusion of the operation.

65.     CSX Operating Rule 505.12 (which was in effect in June 2016) requires accurate completion of the Switch Position Awareness Form and reporting of the switch's status to the train dispatcher.

66.     On the morning of June 9, 2016, at approximately 10:25 a.m., Plaintiff received permission from the dispatcher to go onto an industry's siding; as a result, he unlocked the mainline switch and lined the switch to allow train movement from the mainline to the siding.

67.     Plaintiff operated the switch manually using a vertical pole as a lever.

68.     After Plaintiff unlocked the switch and lined it to allow train movement onto the

siding, he and Mr. Pigula moved empty railcars from the siding onto the mainline, and moved loaded railcars onto the siding.

69. After completing the switching operation, Plaintiff, from the ground, notified Mr. Pigula that he had returned the QM 106.9 switch to the normal position.

70. Mr. Pigula, the only other individual present during the switching operation, did not witness Plaintiff restore the switch to the normal position at the end of the switching operation.

71. Based on Plaintiff's representation to him, Mr. Pigula noted on the Switch Position Awareness Form that the QM 106.9 switch had been normalized at 10:33 a.m.

72. After completing the movement of railcars out of the siding and onto the mainline, Plaintiff notified the train dispatcher by radio that the switch was properly lined and locked and clear for mainline train traffic.

73. Based on the information provided by Plaintiff about the switch having been returned to its normal position, the dispatcher reopened the mainline track to other trains.

74. At approximately 11:35 a.m. on the same day (and approximately an hour after the switch had been noted to be normalized), the crew of a southbound train (Q15308) on the mainline track observed too late that the switch was improperly lined for the industry siding (rather than the mainline track) and the train ran through the switch; the crew was able to safely stop its train and it reported the condition to the dispatcher.

75. Mr. Lacy first learned about the misaligned switch when he heard the dispatcher on the radio discuss the southbound train's run-through at that switch.

76. Mr. Lacy was approximately 30 to 40 minutes away from the QM 106.9 switch

when he heard the radio transmission, but drove to the location where he met with the CSX

police investigator and observed that the switch was misaligned and locked.[21]

77.     Defendant maintains an electronic record of the status of switches called Wayside

Switch Protection ("WASP") that generates reports ("WASP reports").[22]

78.     A WASP report indicates whether a switch is lined for the mainline or not and the

time of changes in that status.[23]

---

[21]     Plaintiff admits this asserted fact, but argues that CSX's Train Accident Report and Police Incident Report are inadmissible hearsay that should not be considered on this motion. (Dkt. No. 50, Attach. 28, at ¶ 77 [Pl.'s Rule 7.1 Resp.].)  Defendant argues in its reply that these documents are records kept in the course of a regularly conducted business activity and thus are admissible pursuant to Fed. R. Evid. 803(6).  (Dkt. No. 54, Attach. 1, at 30.)  The Court notes that (although a party moving for summary judgment may not of course rely on its own responses to its opponent's request for admissions) Defendant's Response to Plaintiff's Requests for Admission dated December 17, 2018, acknowledges that the group of documents that includes both of these reports (a) were created by Defendant, (b) were created in the normal course of business, (c) are genuine and authentic, and (d) were kept in the ordinary course of business. (Dkt. No. 40, Attach. 2, at 18-19.)  The Court also notes that these records were made by persons with knowledge at or near the time of the accident and investigation (Mr. Lacy, who it is undisputed was at the scene not long after the accident, and David Newman, the CSX police investigator who investigated the scene).  Additionally, even if the proper authentication is lacking at this stage, there is no reason to believe that this evidence could not be presented in a form admissible at trial.  *See Hill v. Cnty. of Montgomery*, 14-CV-0933, 2019 WL 5842822, at *10 (N.D.N.Y. Nov. 7, 2019) (Sannes, J.) ("In general, even if evidence is not properly authenticated at the summary judgment stage, so long as evidence will be presented in admissible form at trial, it may be considered on summary judgment.").  The Court therefore finds that these reports must be considered for the purposes of this motion.

[22]     Plaintiff denies this asserted fact.  (Dkt. No. 50, Attach. 28, at ¶ 78 [Pl.'s Rule 7.1 Resp.].)  However, none of the evidence cited by Plaintiff attempting to show that the specific WASP switch involved here was non-operational or malfunctioning disputes the underlying fact that Defendant maintains the WASP system, or that, as a general matter, the WASP system allows Defendant to keep a record of switch statuses and generate reports.  This fact is therefore deemed admitted.

[23]     The Court notes that, despite evidence that the WASP system might "ping" more often than when the switch changes position, Plaintiff has not cited evidence to dispute the assertion (which is supported by the testimony of Mr. Ammons) that the system will, at

79.     The WASP report for the QM 106.9 switch indicates that the switch was "out of correspondence" continuously between 10:25 a.m. and 3:42 p.m. on June 9, 2016.[24]

80.     Had a northbound train traveling on the mainline encountered the QM 106.9 switch while it was misaligned, that train would have been diverted onto the industry's siding, the results of which could have been catastrophic.

81.     Because train Q15309 was traveling southbound when it ran through the misaligned switch, the result was damage to the switch itself.

82.     After Mr. Lacy inspected the now-broken switch, a repair crew was brought in to repair the switch, after which the WASP report showed a status of "normal" until the next morning.

83.     There was no evidence of vandalism related to the QM 106.9 switch at the relevant time, and Plaintiff testified at the hearing of June 16, 2016, that he was unaware of any

---

minimum, log the status when there is a change in the position of the switch. (Dkt. No. 40, Attach. 13, at 19, dep. p. 70 [Ammons Dep.].)  This asserted fact is therefore deemed admitted.

[24]     Plaintiff disputes the fact that the term "out of correspondence" means that the track was not lined for the mainline, relying in part on the testimony of Mr. Ammons.  (Dkt. No. 50, Attach. 28, at ¶ 80 [Pl.'s Rule 7.1 Resp.].)  However, Plaintiff's citation to Mr. Ammons' testimony takes that testimony out of context; although Mr. Ammons did initially testify that a switch that was not working properly would indicate that it could not be verified that the switch was in normal position by indicating that it was out of correspondence, he quickly backtracked that answer by stating that had been "a guess" and he did not know what precise status would be reported if the switch was not working, only that it would send a message so that Defendant could dispatch a signal maintenance employee.  (Dkt. No. 40, Attach. 13, at 14-15, dep. pp. 52-53).  Plaintiff's expert, Patrick Reilly, does testify that "out of correspondence means that the switch is not indicating anything. . . . [I]t's either normal or reverse and this one says out of correspondence."  (Dkt. No. 50, Attach. 11, at 9 [Reilly Dep.].)  To the extent that this portion of Mr. Reilly's testimony is admissible, this testimony creates a genuine dispute of material fact as to what precisely "out of correspondence" means on a WASP report.  However, because Plaintiff has admitted the remainder of this asserted fact, that portion has been included in this statement.

evidence of vandalism at the relevant time.[25]

84.    Mr. Lacy was personally unaware of any instances in which vandals broke or removed a lock on a switch.

85.    Mr. Miner was personally unaware of any vandalism at the QM 106.9 switch during his 13-year period of employment.

86.    Based on the investigation and the observations of CSX police officer David Newman, CSX maintenance-of-way personnel Mark Kimmis and Jason Race, and local resident Jean Sawyer, the CSX Police Department found, in an Incident Report, that there were no signs of vandalism at the QM 106.9 switch.[26]

87.    According to the Incident Report, the lock was found on the ground next to the switch and it was not broken.

88.    According to the Charge Letter, Hearing Transcript, and Hearing Officer findings, Plaintiff was charged with violations of the Operating Rules governing switching procedures, as a result of the events of June 9, 2016.

89.    Employees who fail to restore a switch to the normal position at the end of

---

[25]    Plaintiff denies this asserted fact; however, none of the evidence he cites in support of that denial consists of any evidence of vandalism at the relevant time. (Dkt. No. 50, Attach. 28, at ¶ 85 [Pl.'s Rule 7.1 Resp.].)  The fact that this switch and others might have been vandalized or tampered with on other occasions does not serve as evidence to create a genuine dispute of material fact as to whether vandalism contributed to the incident on June 9, 2016.

[26]    Although Plaintiff denies this asserted fact, the record evidence he relies on in support of that denial does not controvert the fact that this was the finding and basis of the Incident Report.  This asserted fact is therefore deemed admitted.

switching operations are ordinarily charged with rules violations.[27]

90.     A violation of the Operating Rules governing switching procedures is a decertifiable event, and Plaintiff's FRA Conductor's certification was suspended.

91.     Pursuant to procedures contained in the collective bargaining agreement governing Plaintiff's employment with Defendant, a formal investigative hearing was held on June 16, 2016, at which Plaintiff was represented by his union representative.

92.     The hearing was arranged by Mr. Lewandowski.  As the senior manager (and given the decertifiable nature of the event), Mr. Van Blarcom participated in the hearing; at his deposition, Mr. Van Blarcom testified that he was unaware of anyone who had seen Plaintiff in the vicinity of the switch when Plaintiff alleges he was throwing it closed, although Mr. Van Blarcom also testified that "his engineer was with him and knew he was back there handling switches."

93.     The hearing was conducted by Syracuse Terminal Manager and qualified hearing officer Brian Murray.[28]

---

[27]     Plaintiff denies this asserted fact; however, his citation to evidence establishing that not every such employee was charged with a rules violation, or that those who were charged received punishments less harsh than termination, does not create a genuine dispute of material fact as to whether employees who fail to restore a switch to a normal position at the end of switching operations *are ordinarily* charged with rules violations.  This asserted fact is therefore deemed admitted.

[28]     Plaintiff denies that Mr. Murray was qualified as a hearing officer, arguing that Mr. Murray was aware of Plaintiff's formal complaint to Defendant's ethics hotline.  (Dkt. No. 50, Attach. 28, at ¶ 95 [Pl.'s Rule 7.1 Resp.].)  However, the only evidence Plaintiff cites in support of his contention is Mr. Lacy's testimony that Plaintiff's complaint had become "common knowledge" *at some point* and that Mr. Lacy "may have" discussed that complaint with Mr. Murray; however, Mr. Lacy states that any conversation they would have had would have been "all general," such as "if this were to happen, what would you do," not "specifics" about the complaint.  (Dkt. No. 40, Attach. 12, at 17, dep. p. 141 [Lacy Dep.].)  Plaintiff

94.     At the hearing, Plaintiff and his union representative were afforded an opportunity to present witnesses, cross-examine Defendant's witnesses, and introduce into the record information or exhibits pertinent to the matter being investigated.[29]

95.     Based on the evidence presented at the formal investigative hearing on June 16, 2016, Mr. Murray found that Plaintiff had violated Operational Rules 408.8, 408.9, 408.13, and 505.12.  More specifically, Mr. Murray concluded that, "after reviewing the WASP/Log of the switch that is kept by the electronic log system, it is plainly clear in this investigation that the principal lied throughout the course of this investigation . . . I recommend that this employee be handled with the maximum punishment for this incident according to the [Individual Development and Personal Accountability Policy ("IDPAP")] for the seriousness of this offense."[30]

_____

therefore has not offered any admissible evidence that Mr. Murray was aware of Plaintiff's complaint at the time of the hearing, and that his knowledge rendered him unqualified. Additionally, Plaintiff argues that the findings of the Hearing Officer are inadmissible hearsay. Defendant argues that this evidence is admissible as a record kept in the course of regularly conducted business activity pursuant to Fed. R. Evid. 803(6).  (Dkt. No. 54, Attach. 1, at 36.) For many of the same reasons discussed above in note 20 of this Decision and Order, the Court finds that Hearing Officer's findings are admissible for the purposes of this motion.

[29]     Plaintiff denies that he was afforded such an "opportunity" by arguing that the fact that the disciplinary hearing occurred only seven days after the incident and three days after he was charged means that he was not afforded a *sufficient* opportunity to collect the evidence that would have been beneficial to him in presenting his case.  (Dkt. No. 50, Attach. 28, at ¶ 96 [Pl.'s Rule 7.1 Resp.].)  However, Plaintiff does not create a genuine dispute of material fact regarding whether he was permitted at the hearing to do the three things listed in the above-asserted fact; he was.  The asserted fact is therefore deemed admitted.

[30]     Plaintiff denies this asserted fact by arguing that the Hearing Officer findings are inadmissible, that Mr. Murray's determination is wrong, and that Mr. Murray was not impartial but was perpetuating Defendant's efforts to retaliate against him for his ethics complaint.  (Dkt. No. 50, Attach. 28, at ¶ 97 [Pl.'s Rule 7.1 Resp.].)  However, these reasons have either already been rejected by the Court in this Decision and Order or do not address the relevant asserted fact.

96.     Defendant's IDPAP subjects employees to dismissal for a first major offense that, for example, recklessly endangers the safety of Defendant's employees or the public.

97.     According to the Discipline Letter, Plaintiff was dismissed from employment with Defendant as a result of Mr. Murray's findings from the hearing of June 16, 2016.[31]

98.     The Discipline Letter, which stated that "it has been determined that [Plaintiff] violated" the rules in question, was signed by Albany Division Manager Bill Setser.

99.     The decision to dismiss Plaintiff was consistent with Defendant's treatment of six of the 17 other employees charged with similar rule violations (i.e., Employee Nos. 1, 11, 12, 13, 14, and 15); however, Mr. Pigula was not charged or disciplined with regard to the incident of June 9, 2016, and he is still employed by Defendant.

### C.     Parties' Briefings on the Pending Motions

#### 1.     Defendant's Motion for Summary Judgment

##### a.     Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant asserts four arguments. (Dkt. No. 40, Attach. 38, at 15-29 [Def.'s Mem. of Law].)  First, Defendant argues that Plaintiff did not engage in protected activity under the FRSA when he reported the orders to falsify information on his OBWO because this action did not implicate a safety issue. (*Id.* at 15-21.)  More specifically, Defendant argues as follows: (a) OBWOs are not safety devices in that they are not

---

The asserted fact is therefore deemed admitted.

[31]     Plaintiff denies this asserted fact. (Dkt. No. 50, Attach. 28, at ¶ 99 [Pl.'s Rule 7.1 Resp.].)  However, Plaintiff's legal argument that these findings were a pretext for retaliation does not create a genuine dispute as to the asserted fact; the record substantiates that the June 2016 incident was at the very least the stated reason for Plaintiff's termination.  The asserted fact is therefore deemed admitted.

regulated or mandated by federal law and are merely a way for Defendant's customers to track their deliveries; (b) Plaintiff's assertion that reporting false information caused him to be preoccupied or stressed while working does not implicate a safety concern because it involves only his personal health or state of mind; and (c) the fact that an OBWO would contain information on railcars that might contain hazardous materials does not automatically turn the falsification of data on an OBWO into a safety issue, particularly because this theory (that OBWOs contain data related to hazardous materials) was first raised by Plaintiff's expert and there is no evidence that it was part of Plaintiff's thinking at the time he made his ethics complaint. (*Id.*)

Second, Defendant argues that, even if Plaintiff is found to have engaged in a protected activity, there is no evidence that his ethics complaint and other reports to his supervisors were a contributing factor in his dismissal from employment. (*Id.* at 22-28.) More specifically, Defendant argues as follows: (a) the dismissal occurred more than a month after Plaintiff made his ethics complaint and the rule violation relating to the misaligned track switch was an intervening event that broke any presumption of causation; (b) Plaintiff was terminated based on a violation of a widely applicable policy and there is no admissible record evidence that Defendant applied this policy inconsistently against Plaintiff (as compared to similarly situated employees); (c) there is no admissible record evidence that Defendant acted with hostility following Plaintiff's ethics complaint, particularly given that the evidence shows that Defendant immediately investigated Plaintiff's allegations and reprimanded the offending supervisors, that he had a full hearing presided over by an uninvolved party (and with union representation) before his dismissal, and that the individual who rendered the ultimate termination decision was not

involved in Plaintiff's ethics complaint; and (d) no disciplinary or other adverse actions were taken against Mr. Pigula, who also filed an ethics complaint related to the OBWO falsification. (*Id.*)  Defendant also argues that the issue is not whether Plaintiff did or did not fail to normalize the track switch as charged, but whether Defendant's finding that he failed to do so was the real reason for his termination and not merely pretext for retaliation.  (*Id.* at 27-28.)

Third, Defendant argues that (a) the handbrake charge issued against Plaintiff in April 2016 does not constitute an adverse action for the purposes of establishing a prima facie case of retaliation because there was no change in the terms of his employment given that he received only a written reprimand after voluntarily accepting responsibility and waiving his right to a full investigation and hearing, and (b) the ethics complaint was nevertheless not a contributing factor to the handbrake charge because that charge predated Plaintiff's ethics complaint.  (*Id.* at 21-22.)

Fourth, Defendant argues that, even if Plaintiff could establish a prima facie case of retaliation, it has shown by clear and convincing evidence that it would have dismissed Plaintiff absent his ethics complaint because the evidence overwhelmingly supports its finding that he failed to properly normalize the track switch and it treated him in a manner that was consistent with its disciplinary policy and its treatment of other employees; Defendant argues in particular that it dismissed two other employees for similar violations within six months of Plaintiff's violation.  (*Id.* at 28-29.)

### b.    Plaintiff's Opposition Memorandum of Law

Generally, in his opposition to Defendant's motion, Plaintiff asserts six arguments.  (Dkt. No. 50, Attach. 31, at 14-43 [Pl.'s Opp'n Mem. of Law].)  First, Plaintiff argues that his complaints to his managers and to the ethics hotline were protected activity in that they reported

a hazardous safety or security condition.  (*Id.* at 14-21.)  More specifically, Plaintiff argues that falsification of information on the OBWO was a threat to safety because (a) the OBWO was the only source of real-time information about the location of railcars, including those that contained hazardous materials, and Plaintiff reported that Defendant was having difficulty locating railcars as a result of the falsifications, (b) the dangers of this were known to Defendant, whether Plaintiff explicitly stated them or not, (c) he is not required to show that his distraction violated any federal law or rule, and his expert witness has opined that the resulting distraction was a hazardous safety or security condition, and (d) the coercion to falsify OBWO data by Mr. Van Blarcom and Mr. Lacy created a hostile work environment that also constituted a hazardous safety or security condition.  (*Id.*)

Second, Plaintiff argues that his claim arises under 49 U.S.C. § 20109(b)(1)(A), rather than 49 U.S.C. § 20109(a)(1), and thus does not require a showing of objective reasonableness, but rather only a showing of subjective reasonableness.  (*Id.* at 21-23.)  Additionally, Plaintiff argues that, even if the Court were to construe his claim as arising under 49 U.S.C. § 20109(a)(1), the fact that he reasonably believed that Defendant's conduct was a violation of a federal law or regulation would have been sufficient under that statute.  (*Id.*)

Third, Plaintiff argues that the handbrake charge assessed against him was an adverse action because (a) the protections of the FRSA cannot be waived and are meant to cover a broad range of adverse actions, and (b) his decision to voluntarily waive his right to an investigation and hearing was due to the intimidation he felt at the prospect of losing "years of income" if he exercised his rights.  (*Id.* at 23-25.)

Fourth, Plaintiff argues that the burden of showing that protected activity was a

contributing factor in an adverse action is low in that he must only show that it was one reason for the adverse action and need not demonstrate the existence of a retaliatory motive. (*Id.* at 25-28.)

Fifth, Plaintiff argues that he has met his low burden to show that his protected activity was a contributing factor in his termination. (*Id.* at 44-45.) More specifically, Plaintiff argues as follows: (a) there is evidence that Defendant was intending to discipline him for insubordination related to his refusal to falsify data; (b) the evidence establishes that he had made complaints about the request to falsify data before he was charged with a handbrake violation, even if his formal ethics complaint was not made until after that charge; (c) there is sufficient temporal proximity between his complaints and the adverse actions because he was faced with the handbrake charge and other discriminatory actions within days of his initial complaints, and intervening events do not always sever the temporal link, such as here where the decision-makers all had direct knowledge of his protected activities; (d) Defendant displayed general widespread hostility to safety and injury complaints, openly threatened Plaintiff with insubordination charges for refusing to falsify OBWO data, and watched him closely for mistakes following his complaints; and (e) Mr. Van Blarcom demonstrated a "fervor" to catch Plaintiff in a rules violation and Defendant terminated his employment without contacting other people who had access to the relevant track-switch or acknowledging that the track-switch reporting system was not operating properly. (*Id.* at 28-40, 44-45.)

Sixth, Plaintiff argues that Defendant inconsistently applied its own rules because (a) the handbrake rule was both vague in application and not consistently applied in different rail yards or by different managers, (b) Plaintiff received greater scrutiny than other employees, (c) the

insubordination charge was ultimately determined to be unfounded, and (d) the evidence indicates that leaving a track switch open was not always a terminable offense. (*Id.* at 40-43.)

c. **Defendant's Reply Memorandum of Law**

Generally, in its reply memorandum of law, Defendant asserts four arguments. (Dkt. No. 54, at 5-18 [Def.'s Reply Mem. of Law].) First, Defendant argues that inputting inaccurate information in the OBWO is not a safety hazard for the following reasons: (a) contrary to Plaintiff's argument, he must show that his belief in the hazard was objectively reasonable as well as subjectively reasonable; (b) the purpose of the OBWO is not to track hazardous materials and it is not required or used on all trains, and, even on trains with OBWOs, there is always the required paper documentation to show where the hazardous material railcars are located in compliance with the relevant regulations; and (c) because Plaintiff did not raise the issue of inability to locate hazardous materials until well after the commencement of this lawsuit, this cannot constitute a basis for protected activity, and, in any event, there is no admissible record evidence to support a finding that the location of any hazardous material railcars were falsified. (*Id.* at 5-11.)

Second, Defendant argues that Plaintiff's reported distraction was not a safety hazard because subjective stress does not create a sufficient safety concern under the FRSA, and his argument that the existence of a hostile work environment creates a hazardous safety or security condition is not supported by the relevant legal authority. (*Id.* at 11-13.)

Third, Defendant argues that the contributing-factor test requires a showing that there was intentional retaliation prompted by the employee's protected activity (i.e., a discriminatory animus), and that Plaintiff's complaints were not a contributing factor to his termination. (*Id.* at

27

13-15.)

Fourth, Defendant argues that Plaintiff has not shown that he was the subject of retaliation for the following reasons: (a) he has not provided any evidence of retaliatory animus; (b) the record shows that the incident involving the misaligned track switch was an intervening event between his protected activity and the adverse action; (c) there was no reasonable evidence that the track switch was vandalized, and the WASP system showed that Plaintiff had never normalized that switch; and (d) Plaintiff's termination was consistent with Defendant's treatment of other employees for similar rules violations.  (*Id.* at 16-18.)

### 2. Defendant's Motion to Exclude Expert Testimony

#### a. Defendant's Memorandum of Law

Generally, in its motion to exclude the testimony of Plaintiff's expert witness, Defendant argues that Mr. Reilly's testimony is impermissible under the relevant standards because (a) it provides no help to the factfinder in that it is essentially a regurgitation of the factual narrative found in the other evidence and a conduit for hearsay evidence, (b) it includes improper opinions about the motives of various individuals, (c) Mr. Reilly's opinions are subjective or speculative and do not involve an application of scientific or technical expertise, and he does not have specialized knowledge of OBWOs or internal CSX procedures, and (d) his testimony includes legal conclusions that usurp either the role of the judge in instructing the jury on the law or the role of the jury in applying the law to the facts.  (Dkt. No. 41, at 8-16.)

#### b. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition to Defendant's motion to exclude Mr. Reilly's testimony, Plaintiff argues that the testimony is admissible because it (a) relates to technical and logistical

matters of which jurors have no knowledge, including how railroads and first responders locate

hazardous materials railcars in an emergency and how switching operations are performed, (b)

relates to other matters of railroad safety of which jurors have no knowledge, including the

policies underlying the safety regulations, the impact of falsification on safety, how a hostile

work environment or stress could impact safety, and the industry standards for dealing with

reports of an unsafe environment, and (c) provides critical information about the WASP system

and how it works, something of which the jurors have no knowledge. (Dkt. No. 51, at 9-29.)

c.     **Defendant's Reply Memorandum of Law**

Generally, in its reply memorandum of law, Defendant argues as follows: (a) many of the

statements in Mr. Reilly's expert reports that Plaintiff calls opinions are merely an attempt to

create facts that are not otherwise supported by the record, including statements about responses

to emergencies, locating hazardous railcars, and matters related to OBWOs; (b) there is no need

for testimony regarding Mr. Van Blarcom's and Mr. Lacy's motive to falsify data because it is

already undisputed what their motive was (i.e., to improve their performance scores); (c) jurors

can understand the effect of stress in a workplace without expert testimony; and (d) any

testimony about the WASP system must be excluded because it was not disclosed in Mr. Reilly's

reports. (Dkt. No. 55, at 5-7.)

## II.     LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record

support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Finally, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

After carefully considering whether Plaintiff can establish a prima facie case of retaliation pursuant to 49 U.S.C. § 20109, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law.  (Dkt. No. 40, Attach. 38, at 15-21 [Def.'s Mem. of Law]; Dkt. No. 54, at 5-13 [Def.'s Reply Mem. of Law].)  To those reasons, the Court adds the following analysis.

As Plaintiff argues in his opposition memorandum of law, the Complaint asserts a claim under 49 U.S.C. § 20109(b)(1)(A), which states that "[a] railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge,

31

demote, suspend, reprimand, or in any other way discriminate against an employee for . . .

reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A);

(*See* Dkt. No. 1, at ¶¶ 36-38 [Pl.'s Compl., alleging that he engaged in protected activity by

reporting, "in good faith, a hazardous safety or security condition"]; Dkt. No. 50, Attach. 31, at

21 [Pl.'s Opp'n Mem. of Law, clarifying that his claim was brought under 49 U.S.C. §

20109(b)(1)(A), not 49 U.S.C. § 20109(a)(1)].)

"To establish a prima facie case of retaliation under the FRSA, an employee must show

by a preponderance of the evidence that he (1) engaged in protected activity as defined by the

statute; (2) his employer knew that he had engaged in protected activity; (3) he suffered an

unfavorable personnel action; and (4) the protected activity was a contributing factor in the

unfavorable action." *Niedziejko v. Delaware & Hudson Ry. Co., Inc.*, 18-CV-0675, 2019 WL

1386047, at *36 (N.D.N.Y. Mar. 27, 2019) (Suddaby, C.J.) (collecting cases). "If the plaintiff

satisfies all of these requirements, then the burden shifts to the employer to demonstrate by clear

and convincing evidence that the employer would have taken the same personnel action in the

absence of the protected activity." *Niedziejko*, 2019 WL 1386047, at *36 (internal quotation

marks omitted).

Here, Defendant does not appear to dispute that it was aware of Plaintiff's complaints

(including his formal complaint to the ethics hotline, which was investigated by Defendant), or

that Plaintiff suffered an unfavorable personnel action through his termination (although it does

dispute that the discipline imposed on Plaintiff following charges related to the failure to set the

handbrake on separated cars was an unfavorable personnel action for the purposes of Plaintiff's

claim). The Court therefore need not consider the second and third elements of this claim in any

detail, but need only consider the first and fourth elements of this claim.

To establish the first element of this claim, a plaintiff must show that he had a reasonable belief that the activity he was reporting was a hazardous safety or security condition, which requires a showing that the belief was both objectively and subjectively reasonable. *See Niedziejko*, 2019 WL 1386047, at *37 ("A plaintiff must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation."); *March v. Metro-North R.R. Co.*, 369 F. Supp. 3d 525, 532-33 (S.D.N.Y. 2019) (agreeing with various circuit courts that the term "reasonable belief" in the FRSA whistleblower statute contains both subjective and objective components).

The protected activity that Plaintiff alleges consists of both his informal expressions to Mr. Van Blarcom and Mr. Lacy and his formal ethics complaint with Defendant's internal ethics hotline; both of these communications involve reporting Plaintiff's concerns related the safety implications of falsifying data in the OBWOs.

In his ethics complaint of May 3, 2016, Plaintiff reported, in relevant part, that (a) Mr. Van Blarcom told him to falsify information to say that work was completed when it was in fact not completed, which has resulted in customers noticing that work is not finished despite the work having been reported as finished, (b) Mr. Van Blarcom told him to falsify departure times from the Watertown yard, (c) Mr. Lacy told him to mark down work that did not get done in a day as a "customer request," and (d) "this is a safety issue because employees are not focused on their work and are preoccupied with the harassment coming from [Mr. Van Blarcom] and [Mr. Lacy.]" (Dkt. No. 40, Attach. 18, at 3-4.) Additionally, as part of the ethics investigation, Plaintiff stated in an interview of June 6, 2016, that, "[i]f one crew did not place a car during

their shift, they would still mark it as placed and the next crew would have to figure out which cars had been placed and which ones had not."  (Dkt. No. 50, Attach. 38, at 24.)

### 1. Effect of Stress and Distraction

The Court is not convinced that Plaintiff has demonstrated that (a) his reported stress qualifies as a "hazardous safety or security condition" pursuant to 49 U.S.C. § 20109(b)(1)(A), (b) in the alternative, his report of such a condition was made in good faith, or (c) in the alternative, his belief that the conduct of Mr. Van Blarcom and Mr. Lacy was a "hazardous safety or security condition" was either subjectively or objectively reasonable.  As an initial matter, although Plaintiff reported in his ethics complaint that "employees" were unfocused and preoccupied," he has presented no admissible record evidence to substantiate that any other employee was affected in the manner that Plaintiff alleges he was affected.  (*See* Dkt. No. 40, Attach. 6, at 11-13, dep. pp. 37-43 [Miner Dep., testifying that the orders to falsify OBWO data themselves never distracted him from his work and threats of insubordination did not make him feel less safe about his own or others' work, although being interviewed related to Plaintiff's ethics complaint did make him nervous]; Dkt. No. 40, Attach. 10, at 6, dep. pp. 55-57 [Pigula Dep., stating that the orders to falsify records were not affecting Mr. Miner, although he did not know whether they were affecting engineer Steve Spaziani].)  As a result, there is no admissible record evidence of any wide-scale distraction concerns at the Watertown yard, only as to Plaintiff specifically.

The objective reasonableness of an employee's belief is "based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee."  *Hernandez v. Metro-North Commuter R.R.*, 74 F. Supp.

3d 576, 580 (S.D.N.Y. 2015) (quoting *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 [2d Cir. 2014]).  As noted in *Hernandez*, even if the employee reasonably or honestly believed that the relevant condition was unlawful, he still must show that it was related to safety or security. *Hernandez*, 74 F. Supp. 3d at 580.[32]  Thus, the fact that Mr. Van Blarcom and Mr. Lacy ordered Plaintiff to falsify data in violation of CSX internal rules, threatened him with insubordination if he did not do so, and harassed him in order to induce him to do so would not make his complaint about those actions a protected activity under FRSA unless it was both subjectively and objectively reasonable for Plaintiff to have believed that those actions constituted a "hazardous safety or security condition."

"Hazardous safety or security conditions" have generally been found to be physical conditions that are within the control of the rail carrier employer; circumstances outside of the carrier's control and non-work related conditions are not included.  (Dkt. No. 50, Attach. 31, at 15-16, 20-21 [Pl.'s Opp'n Mem. of Law, citing cases finding that such a condition consisted of the presence of oil in a locomotive, the existence of a defective derail handle, the fouling of an unprotected track, the failure to seal an area for asbestos abatement, the malfunctioning of a speed device, the presence of bedbugs, the wearing of seatbelts during a certain rail procedure, the use of an excavator despite insufficient training, the existence of a bridge with no walkway, siderails or safety lighting, and the presence of a smoky smell]).  *See also Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 664 (S.D.N.Y. 2017) (finding that the plaintiff's use of prescribed narcotics for a previous work-related shoulder injury was not a hazardous safety or

---

[32]  Although *Hernandez* addressed a different subsection of 49 U.S.C. § 20109, its rationale generally applies to this case in that Plaintiff is required to show under 40 U.S.C. § 20109(b)(1)(A) that what he reported was a hazardous safety or security condition.

security condition because FRSA covers only "work-related safety conditions under the rail carrier's control"); *Williams v. Illinois Cent. R.R. Co.*, 16-CV-0838, 2017 WL 2602996, at *1-2 (S.D. Miss. June 15, 2017) (finding that an employee's refusing to finish his shift due to suspected heart attack symptoms [that were later assessed to be anxiety or stress related] was not included in the definition of a "hazardous safety or security condition" for the purposes of 49 U.S.C. § 20109[b], noting in particular that 49 U.S.C. § 20109[a][4] provides for protections for an employee who notifies the railroad carrier of "a work-related illness");[33] *Murdock v. CSX Transp., Inc.*, 15-CV-1242, 2017 WL 1165995, at *5 (N.D. Ohio Mar. 29, 2017) (finding that reports of dizziness, difficulty breathing, and shortness of breath resulting from a personal illness that allegedly made it impossible for the plaintiff to operate or be near heavy equipment safely was not a "hazardous safety or security condition" under 49 U.S.C. § 20109[b]).  Here, although the alleged orders, threats, and harassment were within the control of Mr. Van Blarcom and Mr. Lacy (as the individuals engaging in that behavior), Plaintiff's response to those actions was not within their control, and it is from Plaintiff's response that the alleged "hazardous safety or security condition" arises.  Of note, the Court has not found any cases (from either a federal court or the Administrative Review Board) in which a plaintiff's subjective reaction to conduct that is otherwise not safety-related, without more, was sufficient to establish a "hazardous safety or security condition."  The circumstances presented here are more similar to those in *Lockhart* than to those in any of the physical condition cases Plaintiff relies on; even if the underlying condition

---

[33]      To the extent that Plaintiff's stress and distraction could be considered a "work-related personal injury or work-related illness," he has made clear in his opposition memorandum of law that his claim is asserted pursuant to 49 U.S.C. § 20109(b)(1)(A), not 49 U.S.C. § 20109(a).  (Dkt. No. 50, Attach. 31, at 21 [Pl.'s Opp'n Mem. of Law].)

was work-related (e.g., in *Lockhart*, the remote shoulder injury, and, in this case, the actions of

Mr. Van Blarcom and Mr. Lacy), Defendant had no control over Plaintiff's reaction to that

condition, and it was that reaction (rather than the condition itself) that caused the alleged

"hazardous safety and security condition" (e.g., in *Lockhart*, the plaintiff's occasional use of

narcotics, and in this case, Plaintiff's distraction). As a result, the Court finds as a matter of law

that Plaintiff has not shown that the alleged condition constituted a "hazardous safety or security

condition" within the scope of FRSA.

The Court's finding is further supported by the fact that Plaintiff has not provided any

admissible record evidence to establish that Mr. Van Blarcom or Mr. Lacy engaged in their

purported harassing conduct (and thus distracted him) while Plaintiff was engaging in safety-

sensitive railroad work; rather, his allegation is that it was his own repetitive rumination on their

previously made orders and threats of insubordination (or anticipation of future harassment) that

caused him to be distracted while working. (Dkt. No. 40, Attach. 4, at 13-14, dep. pp. 45-46 [Pl.

Dep., testifying that he was anxious and his mind was not on his job over having to have a phone

call with Mr. Van Blarcom every morning in which he would be "reamed out" for issues from the

previous day]; Dkt. No. 40, Attach. 5, at 9, dep. pp. 70-71 [Pl. Dep., testifying that Mr. Van

Blarcom and Mr. Lacy were harassing him "every morning," which then impacted his ability to

focus on his work throughout the rest of the day].) The only apparent behavior that occurred

while Plaintiff was physically working is found in his testimony that Mr. Van Blarcom would

sometimes watch him and Mr. Pigula perform switching operations at the start of their day and

afterwards criticize their performance (including the time it took for them to do that work); but

there is no admissible record evidence showing that this behavior involved any orders to falsify

information in the OBWO.  (Dkt. No. 40, Attach. 4, at 13, dep. pp. 43-44 [Pl. Dep.].)

As to Plaintiff's citation of cases involving a hostile work environment or poor communication as a "hazardous safety or security condition," those cases are inapposite. *Rossi v. Nat'l R.R. Passenger Corp.*, 16-CV-1111, 2016 WL 2609790 (E.D. Pa. May 6, 2016), involved threats of physical violence. *Rossi*, 2016 WL 2609790, at *1, 3 (relying on another case involving threats of physical violence when determining that the threats and intimidation might be protected activity). *Rookaird v. BNSF Ry. Co.*, 14-CV-0176, 2015 WL 6626069 (W.D. Wash. Oct. 29, 2015) (the case relied on *Rossi*), involved allegations of a hostile work environment as a result of threats of violence. *Rookaird*, 2015 WL 6626069, at *5. *In the Matter of Leiva v. Union Pacific R.R. Co.*, Nos. 14-ARB-0016 & 14-ARB-0017, 2015 WL 3539576 (Dep't of Labor Admin. Rev. Bd. May 29, 2015), involved an incident in which a conductor became "belligerent," yelled at the engineer, pointed his fingers in the engineer's face, used profanity toward the engineer, and told the engineer he did "not know who he was messing with," conduct that the complainant alleged prevented the level of communication required between an engineer and a conductor to allow the safe operation of a train; the Administrative Review Board found that "the discordant and potentially violent situation between the engineer and the conductor of the train itself had the tendency to create a hazardous safety or security condition." *Leiva,* 2015 WL 3539576, at *1, 4.

Plaintiff has not alleged any physical violence or even threats of violence; rather, he alleges threats of insubordination charges or termination that caused him stress.  Plaintiff attempts to make his situation seem similar to the one in *Leiva* by pointing to testimony from his deposition indicating that his stress and distraction was causing communication difficulties with

Mr. Pigula, who "made it clear" to Plaintiff "that my head wasn't in the game," and testimony from Mr. Pigula's deposition that the communication between them was impacted because Plaintiff would "absent-mindedly walk past things or fail to complete a routine task" due to his preoccupation. (Dkt. No. 40, Attach. 5, at 9, dep. pp. 70-72 [Pl. Dep.]; Dkt. No. 40, Attach. 10, at 6, dep. pp. 55-57 [Pigula Dep.].) However, there is no admissible record evidence establishing that any disconnect in communication between Plaintiff and Mr. Pigula as a result of Plaintiff's distraction was as severe as the "discordant and potentially violent situation" present in *Leiva.*

As to Plaintiff's argument that a "hostile work environment" constitutes a "hazardous safety or security condition," Plaintiff misinterprets the cited authority. Plaintiff argues that the Administrative Review Board found in *In the Matter of Michael Williams v. Nat'l R.R. Passenger Corp.*, 12-ARB-0068, 2013 WL 6971139 (Dep't of Labor Admin. Rev. Bd. Dec. 19, 2013), that reporting a hostile work environment equates to reporting a hazardous safety condition. (Dkt. No. 50, Attach. 31, at 18-19 [Pl.'s Opp'n Mem. of Law].) *Williams* says no such thing. Rather, the Administrative Review Board merely found that a hostile work environment could be a basis for asserting a whistleblower claim for the purpose of proving the adverse-action element of a retaliation claim. *Williams*, 2013 WL 6971139, at *4. This is evident from the fact that the Administrative Review Board noted that the abusive conduct forming the basis of the hostile work environment "must occur because of the protected activity." *Id. Williams* therefore says nothing about hostile conduct that occurs *before* a protected activity, much less that such hostile conduct automatically constitutes a hazardous safety or security condition. Plaintiff cites no other authority to support his argument that non-violent harassing conduct such as threatening insubordination charges or termination constitutes a "hazardous

39

safety or security condition" sufficient to make Plaintiff's reporting of that conduct a protected activity.

Based on the above, the Court finds that Plaintiff has failed to establish that he reported a "hazardous safety or security condition" for the purposes of 49 U.S.C. § 20109(b)(1)(A).[34] Additionally, the Court is not convinced that, based on the admissible record evidence, a reasonable factfinder could conclude that Plaintiff's belief that his distraction under the circumstances constituted a hazardous safety or security condition was objectively reasonable.

### 2. Location of Railcars and Hazardous Materials

Although it appears that courts have not routinely addressed this point of law explicitly, the Court agrees with Defendant that Plaintiff must have held the requisite belief about the existence of a specific hazardous safety condition at the time he made his informal objections, made his ethics complaint, and/or engaged in follow-up interviews to assist Defendant's ethics investigation in order to establish a protected activity based on that specific "hazardous safety or security condition." *See Hernandez*, 74 F. Supp. 3d at 580 (finding that plaintiff had failed to meet the subjective prong because "[t]here is no indication in the record that the plaintiff

---

[34] The Court finds that Mr. Reilly's opinion that Plaintiff's distraction was a "hazardous safety or security condition" does not suffice to raise a genuine dispute of material fact on this issue because that opinion is either a legal conclusion or an issue of fact that is reserved to the jury after consideration of the facts and the law, and is therefore inadmissible. *See Ashmore v. CGI Croup Inc.*, 138 F. Supp. 3d 329, 343 (S.D.N.Y. 2015) ("The question whether a plaintiff's belief was objectively reasonable is a mixed question of law and fact, meaning that it should be decided by the Court only if there is no genuine issue of material facts as to the belief's reasonableness.") (internal quotation marks omitted); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 343 (N.D.N.Y. 2013) (D'Agostino, J.) (noting that expert testimony cannot 'usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it,'" and that "[expert witness] statements embodying legal conclusions exceed[] the permissible scope of opinion testimony under the Federal Rules of Evidence.").

considered that working on a personal car on company time might be a safety concern *when he made the report to the IG*") (emphasis added). Such a finding is warranted by the nature of the analysis that must be performed, which, as discussed above, regards whether Plaintiff had both a subjectively and an objectively reasonable belief that the activity he was reporting was a "hazardous safety or security condition." There is simply no way to assess whether a belief was reasonable without considering specifically the circumstances at the time that belief was had (i.e., when the protected activity occurred). Notably, cases assessing whistleblower claims under the Sarbanes-Oxley Act and the Consumer Product Safety Improvement Act (which require proof of the same elements as a claim under the FRSA, including a showing of a subjectively and objectively reasonable belief as to protected activity) note that "[t]he objective prong of the reasonable belief test focuses on the basis of knowledge available to a reasonable person *in the circumstances* with the employee's training and experience." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 114 (2d Cir. 2019) (emphasis added); *accord, Ashmore v. CGI Group Inc.*, 138 F. Supp. 3d 329, 341 (S.D.N.Y. 2015); *see also Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811-12 (6th Cir. 2015) (noting in whistleblower action under the Sarbanes-Oxley Act that "the reasonableness of the employee's belief will depend on the totality of the circumstances known [or reasonably albeit mistakenly perceived] by the employee *at the time of the complaint*, analyzed in light of the employee's training and experience") (emphasis added). As a result, Plaintiff must show that he had a subjectively and objectively reasonable belief that the OBWO falsifications created a safety risk by specifically preventing the ability to locate railcars (and, by association, hazardous materials) at the time he made his ethics complaint.

Plaintiff's theory that the falsifications constituted a "hazardous safety or security

condition" based on the inability to track the precise location of railcars on the OBWO (including those containing hazardous materials) appears for the first time in Mr. Reilly's second expert report of February 13, 2019. Plaintiff does not appear to challenge Defendant's assertion that he was required to have reported the basis of his safety concern at the time he made his ethics complaint, but rather argues that Plaintiff "did consider the falsification of the location of railcars to be a safety concern" by reporting the difficulties in locating the railcars. (Dkt. No. 50, Attach. 31, at 16-17 [Pl.'s Opp'n Mem. of Law].) Plaintiff further argues that "[r]eporting the falsification of OBWOs, and reporting that train crews are having difficulty locating railcars as a result, is reporting the falsification of hazmat cars' locations and difficulty in locating hazmat cars," and that "inherent in his complaints [that the demands to falsify were unsafe] were all these dangers that were well-known to management." (Dkt. No. 50, Attach. 31, at 15-16 [Pl.'s Opp'n Mem. of Law]; *see also* Dkt. No. 50, Attach. 32, at ¶ 42 [Pl.'s Statement of Additional Material Facts, asserting that, "[w]henever Mr. Ziparo reported the demands to falsify onboard work orders he was by definition raising the hazardous safety condition of the falsification of the location information of hazardous materials railcars and other railcars."].)

Based on the admissible record evidence, Plaintiff has not established that he believed he was reporting a hazardous safety condition as a result of the falsification of data specifically because of an inability to locate railcars. Plaintiff argues that his statements during his interview of June 6, 2016, indicated that he reported that employees were having difficulty locating railcars. (Dkt. No. 50, Attach. 31, at 15-16 [Pl.'s Opp'n Mem. of Law].) However, no reasonable factfinder could interpret Plaintiff's statement that employees had to, at the beginning of a new shift, "figure out which cars had been placed and which had not" as meaning that

employees had difficulty locating railcars in the way that Plaintiff now suggests; notably, Plaintiff has not pointed to evidence of an instance in which a railcar could not be found as a result of this activity, whether that car contained hazardous materials or not. As a result, the Court cannot say that Plaintiff has provided evidence that he made any statements that an inability to track the locations of railcars was the basis for his belief that a "hazardous safety or security condition" existed. Additionally, Plaintiff cannot rely on inferences he believes Defendant should have drawn to remedy his failure to report a certain basis for his belief of the existence of a "hazardous safety or security condition." *See Dunn v. BNSF R.R. Co.*, 17-CV-0333, 2017 WL 3670559, at *7 (W.D. Wash. Aug. 25, 2017) (finding that a request that notes be kept at safety meetings was not a report of a hazardous safety or security condition because plaintiff failed to provide details about the nature of his concerns other than a vague and conclusory statement); *In the Matter of Ben Winch v. CSX Transp., Inc.*, 15-ARB-0020, 2016 WL 4184208, at *4-5 (Dep't of Labor Admin. Rev. Bd. July 19, 2016) (concluding that complainant had not reported a hazardous safety or security condition by calling off work because he believed working when sick would be a safety issue where the complainant told his employer only to mark him as sick and did not raise his purported safety concerns at that time).

Apart from the fact that the only reports Plaintiff made that were even tangentially related to railcar location were that (a) departure times from the Watertown yard were falsified, and (b) employees would have to figure out which cars had been placed and which had not been placed when beginning their shift, there is nothing in the transcripts of either his ethics complaint or his interview to reasonably suggest that his report on these issues was related to any safety issue, much less the specific one related to the location of railcars containing hazardous materials that

Plaintiff now asserts. Rather, the only reason tied to safety that he provided was that "employees are not focused on their work and are preoccupied with the harassment." In particular, none of the evidence that Plaintiff highlights about his reports of safety concerns indicate that he specifically identified the inability to locate railcars or hazardous materials as a "hazardous safety or security condition"; rather, this evidence all relates to his reports that the pressure to falsify data was causing him to be stressed and distracted. (Dkt. No. 50, Attach. 31, at 16-17, 19 [Pl.'s Mem. of Law].) A reasonable factfinder simply could not conclude, based on the admissible record evidence, that Plaintiff had in mind an inability to locate railcars in the way he now asserts when he made his various complaints.[35] (Dkt. No. 50, Attach. 31, at 16-17 [Pl.'s Opp'n Mem. of Law].) As a result, Plaintiff's newly asserted theory that false information resulting in an inability to locate railcars containing hazardous materials constituted a "hazardous safety or security condition" does not suffice to establish that he engaged in a protected activity. The fact that falsification of location information on an OBWO might constitute a "hazardous safety or security condition" in certain circumstances does not negate the fact that Plaintiff is required to show that he *actually believed* it to be a "hazardous safety or security condition" at the time he made his complaints.

Because the Court has found that Plaintiff cannot establish that he engaged in a protected

---

[35] Additionally, despite the fact that Plaintiff would have known which safety concerns he had at the time he filed his ethics complaint when he filed the Complaint in this action, there is no mention of an inability to locate railcars or hazardous materials in the Complaint, only allegations that the falsification orders caused him stress and made him work unsafely. (Dkt. No. 1, at ¶¶ 10-16 [Pl.'s Compl.].) Although the unverified Complaint is not evidence on a motion for summary judgment, it does define the contours of a plaintiff's claims and it is worth noting that Plaintiff failed to allege such facts while alleging facts related to other reported safety concerns.

activity pursuant to 49 U.S.C. § 20109(b)(1)(A), and he therefore cannot establish a prima facie case of retaliation, Plaintiff's claim must fail and the Court need not elaborate on Defendant's arguments regarding the fourth element of Plaintiff's retaliation claim.  The Court grants Defendant's motion for summary judgment.[36]

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 40) is **GRANTED**; and it is further

**ORDERED** that Defendant's motion to exclude Plaintiff's expert testimony (Dkt. No. 41) is **DENIED** as **moot**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

Dated: March 9, 2020
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge

---

[36]     The Court also finds that it need not decide Defendant's motion to exclude the testimony of Mr. Reilly because that motion is rendered moot by the dismissal of Plaintiff's claim.