20-1196-cv
*Ziparo v. CSX Transp., Inc.*

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

————————

August Term, 2020

Argued: May 27, 2021     Decided: September 24, 2021

Docket No. 20-1196-cv

————————

CODY ZIPARO,

*Plaintiff-Appellant,*

— v. —

CSX TRANSPORTATION, INC.,

*Defendant-Appellee.*

————————

B e f o r e:

SACK, LYNCH, and PARK, *Circuit Judges.*

————————

Plaintiff-Appellant Cody Ziparo sued his former employer, Defendant-Appellee CSX Transportation, Inc., for unlawful retaliation under the Federal Railroad Safety Act ("FRSA"). Ziparo alleges that he was terminated because he engaged in protected activity by "reporting, in good faith, a hazardous safety or

CERTIFIED COPY ISSUED ON 09/24/2021

security condition." 49 U.S.C. § 20109(b)(1)(A). The United States District Court for the Northern District of New York (Suddaby, *C.J.*) granted summary judgment for CSX on the grounds that Ziparo's belief that the subject of his report – pressure from supervisors to make false entries in work reports causing employees undue stress and distraction from their duties – concerned a "hazardous safety or security condition" was objectively unreasonable, and that in any event only physical conditions subject to the railroad's control could constitute such a condition. We conclude that the district court erred in both respects, because the FRSA's protection of reports made "in good faith" requires only that the reporting employee subjectively believe that the matter being reported constitutes a hazardous safety or security condition, regardless of whether that belief is objectively reasonable, and because the statutory text suggests no reason to confine the meaning of "hazardous safety or security condition" to encompass only physical conditions.

Accordingly, we VACATE the judgment of the district court and REMAND to the district court for further proceedings.

————————

P. Matthew Darby, Berman, Sobin, Gross, Feldman & Darby, LLP, Lutherville, MD (H. David Leibensperger, Berman, Sobin, Gross, Feldman & Darby, LLP, Lutherville, MD; Lawrence M. Mann, Alper & Mann, Bethesda, MD, *on the brief*), *for Plaintiff-Appellant.*

Joseph C. Devine, Baker & Hostetler, LLP, Columbus, OH (Ryan A. Cates, Baker & Hostetler, LLP, Columbus, OH; Susan Roney, Benjamin Dwyer, Nixon Peabody, LLP, Buffalo, NY, *on the brief*), *for Defendant-Appellee.*

————————

GERARD E. LYNCH, *Circuit Judge*:

This case presents a question of first impression: Does the Federal Railroad Safety Act's ("FRSA") prohibition of retaliation against employees who "report[], in good faith, a hazardous safety or security condition," 49 U.S.C. § 20109(b)(1)(A), protect only those employees who report conditions that a similarly situated employee would reasonably understand as constituting a hazardous safety or security condition? The United States District Court for the Northern District of New York (Glenn T. Suddaby, *C.J.*) concluded that it does and, accordingly, granted summary judgment for Defendant-Appellee CSX Transportation, Inc. on Plaintiff-Appellant Cody Ziparo's FRSA retaliation claim. On review, we hold that the FRSA's text and purpose do not support the district court's interpretation, and that "good faith" as used in the FRSA requires only that the reporting employee honestly believe that what she reports constitutes a hazardous safety or security condition. We further conclude that the district court erred in defining the term "hazardous safety or security condition" to embrace only physical conditions, a limitation without foundation in the statutory language.

3

Applying our interpretation of the statutory language to the summary judgment record, we conclude that a reasonable jury could find that Ziparo subjectively believed that what he was reporting was a hazardous safety or security condition within the meaning of the FRSA. We therefore VACATE the judgment of the district court and REMAND this case for further proceedings. In doing so, we take no position as to whether a reasonable jury could find that Ziparo was fired at least in part for his reports, rather than, as CSX contends, solely because he was negligent in resetting a switch, with potentially catastrophic consequences – an issue that the district court did not address.

## BACKGROUND

We draw the following statement of facts from the evidence in the summary judgment record, which we construe in the light most favorable to Ziparo. *See, e.g.*, *Cortez v. Foster & Garbus, LLP*, 999 F.3d 151, 153-54 (2d Cir. 2021). To the extent that this opinion references facts contained in the sealed record, those portions of the record are unsealed.

Cody Ziparo worked for CSX as a train conductor from 2006 until 2016, when he was fired. As of October 2015, Ziparo was working in CSX's train yard in Watertown, New York, where he was supervised by trainmasters Ryan Van

4

Blarcom and Jim Lacy. As a conductor, Ziparo's primary duties involved moving railcars onto their designated trains. This process often involves moving cars across parallel tracks, which are connected by manually operated track switches. For most of his career at CSX, including during 2015-2016, Ziparo worked with CSX engineer Christopher Pigula.

CSX conductors carry a tablet computer connected to CSX's "On-Board Work Order" system (the "OBWO"). Conductors use the OBWO to record tasks, such as the placement of cars, as they are completed; information from the OBWO is relayed to an internal customer service center and is ultimately made available to CSX's customers, who use it to track their orders, much as a typical consumer might use the tracking services offered by the Postal Service and similar private couriers to monitor the status of a shipment. The OBWO is not mandated by federal law, and CSX does not use the OBWO on all of its trains. Further, while Ziparo and others testified that CSX employees use the OBWO to locate train cars, there is no evidence that its use for that purpose is anything other than a convenience. There is also no evidence that CSX itself uses the OBWO as a primary means of monitoring the location of train cars or for any

other safety-related purpose. *See, e.g.*, J. App'x at 669-70 (describing use of the OBWO only for logistical and tracking purposes).[1]

In addition to providing information to CSX's customers, the OBWO provides valuable information to CSX by permitting it to track the productivity of its employees. Trainmasters, who are ultimately responsible for overseeing the work of employees in each trainyard, are rewarded with bonuses for meeting certain performance goals as reflected in OBWO data. Such bonuses are not paid to conductors or other lower-level employees.

---

[1] Lacy stated in his affidavit that "[f]irst responders, such as police and fire departments, CSX, and CSX's customers rely on *the information in* the OBWO for the location of train cars in any train emergency, including an emergency involving hazardous materials." J. App'x at 847 (emphasis added). More specifically, Lacy suggested in his deposition testimony that the OBWO is one medium through which an employee might *obtain* documentation helpful to first responders:

> [W]hen you depart on the [OBWO], it gives you a printed hard copy of your work order. And that printed hard copy you can use in the case of any derailments or anything like that. It has your hazmat information and things like that on it so you can present that to an emergency responder if there was an accident.

J. App'x at 226; *see also id.* at 893-94 (testimony of Ziparo's expert Patrick Reilly to the same effect). There is no evidence, however, that the OBWO itself *generates* information that first responders need, or that CSX uses the OBWO actively to *monitor* train locations in real time in order to prevent collisions or derailments.

6

In or around January 2016, Lacy and Van Blarcom began pressuring Ziparo and one of his fellow conductors, William Miner, to mark tasks as complete in the OBWO even though those tasks had not actually been completed. It is undisputed that Lacy's and Van Blarcom's purpose in doing so was to inflate their performance metrics so that they could earn larger bonuses.

Ziparo was not comfortable with these requests, and his refusals to implement them were met with threats of discipline. Both the requests and threats of discipline caused Ziparo stress to the point that he was unable to focus on his work. Pigula testified that communication between him and Ziparo deteriorated significantly, and that Ziparo, unable to focus on his work, "would just absent-mindedly walk past things or fail to complete a routine task." J. App'x at 635. Between January and early May, Ziparo and Pigula repeatedly complained to Lacy and Van Blarcom directly,"t[elling] both of them multiple times that the environment that they're creating is unsafe." *Id.* at 567; *see also id.* at 637 ("We both told Mr. Lacy that it's going to be a safety issue."). In early May, Ziparo met with Lacy in Lacy's office, where he complained again about Lacy's demands that he enter false information into the OBWO and explained that these demands were causing him undue stress. Lacy became frustrated, began yelling

7

at Ziparo, and threatened to charge him with insubordination, although that charge did not materialize.

Unsatisfied by the response to his informal complaints, on May 3, 2016, Ziparo lodged a formal complaint against Lacy and Van Blarcom on CSX's ethics hotline. In his complaint, Ziparo stated that he viewed the ongoing pressure campaign "as a safety issue because employees are not focused on their work and are preoccupied with the harassment coming from Jim [Lacy] and Ryan [Van Blarcom]." *Id.* at 898. CSX interviewed Ziparo in connection with his complaint on June 6.

A few days after that interview, on June 9, a southbound train caused serious damage to a misaligned track switch; had the train been heading north, it likely would have been diverted onto side tracks where train cars were parked and caused a catastrophic collision. Though Ziparo disputes their reliability, CSX's reports show that Ziparo was the last person to operate the switch before the incident and that he failed to return the switch to the proper position after doing so. There is no evidence in the record that anyone else operated the switch at any point between when Ziparo did so and when the accident occurred, nor is there any evidence of tampering.

On June 16, CSX held an investigative hearing, where Ziparo was represented by his union representative. Ziparo was permitted to cross-examine CSX's witnesses and call witnesses to testify on his behalf. On July 15, the hearing officer found Ziparo responsible for failing to return the switch. CSX then terminated Ziparo. CSX subsequently concluded its investigation into Ziparo's complaint and, having found his allegations substantiated, reprimanded Lacy and Van Blarcom.

On June 29, 2017, Ziparo sued CSX for unlawful retaliation under § 20109(b)(1)(A) of the FRSA. On March 9, 2020, the district court granted summary judgment for CSX. *See Ziparo v. CSX Transp., Inc.*, 443 F. Supp. 3d 276, 302 (N.D.N.Y. 2020). The district court concluded that "good faith" as used in § 20109(b)(1)(A) contains both subjective and objective components and that no reasonable jury could find it objectively reasonable for Ziparo to believe that his own stress and distraction resulting from Lacy's and Van Blarcom's improper demands amounted to a "hazardous safety or security condition." *Id.* at 296-300. Further, having defined "hazardous safety or security condition" as a "physical condition[] that [is] within the control of the rail carrier employer," the district court also held that no reasonable jury could find that Ziparo subjectively

9

understood what he was reporting to be a "hazardous safety or security

condition," since it was not such a "physical condition." *Id.* at 297-98. This appeal

followed.

## DISCUSSION

"We review the district court's decision to grant summary judgment *de*

*novo*, resolving all ambiguities and drawing all permissible factual inferences in

favor of the party against whom summary judgment is sought." *Booker v. Graham*,

974 F.3d 101, 106 (2d Cir. 2020), quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805

F.3d 59, 69 (2d Cir. 2015). Further, "[o]ur review of a district court's interpretation

of a statute, a pure question of law, is also *de novo*." *Nielsen v. AECOM Tech. Corp.*,

762 F.3d 214, 218 (2d Cir. 2014).

Section 20109(b)(1)(A) of the FRSA provides that "[a] railroad carrier . . .

shall not discharge, demote, suspend, reprimand, or in any other way

discriminate against an employee for . . . reporting, in good faith, a hazardous

safety or security condition." 49 U.S.C. § 20109(b)(1)(A). To make out a prima

facie case of retaliation under the FRSA, a plaintiff must establish by a

preponderance of the evidence that "(1) the plaintiff engaged in protected

activity; (2) the employer knew that the plaintiff engaged in the protected

10

activity; (3) the plaintiff suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Tompkins v. Metro-North Commuter R.R. Co.*, 983 F.3d 74, 80 (2d Cir. 2020), quoting *Bechtel v. Admin. Rev. Bd.*, 710 F.3d 443, 447 (2d Cir. 2013) (alterations omitted). The district court held that Ziparo had not established the first element of his prima facie case, *i.e.*, that he had engaged in protected activity, because it was not objectively reasonable for him to believe that his own reported stress was a "hazardous safety or security condition" and because he could not have subjectively believed that he was reporting such a condition, since his own stress and distraction did not constitute a "hazardous safety or security condition" as the district court construed that term.

This case, thus, turns on the meaning of two statutory terms: "in good faith" and "a hazardous safety or security condition," the interpretation of which is a matter of first impression for the federal appellate courts. We address each in turn before applying our interpretations to the facts of this case.

## I.    **"In Good Faith"**

"In interpreting any statute, we start with the plain meaning of the text, and absent any ambiguity, we end there too." *Wilson v. United States*, 6 F.4th 432,

11

435 (2d Cir. 2021).

Section 20109(b)(1)(A) protects employees who make reports "in good faith." In general, an act done "in good faith" is one performed "with honesty or sincerity of intention." *In Good Faith*, Oxford English Dictionary (3d ed. 2014); *see also Good Faith*, Black's Law Dictionary (11th ed. 2019) ("A state of mind consisting in (1) honesty in belief or purpose . . . ."). That standard is on its face a subjective one, embracing only the actor's state of mind; it is unconcerned with whether the actor's belief or purpose meets an objective standard of reasonableness.[2]

In contrast, an act or belief is "reasonable" when it is "[f]air, proper, or moderate under the circumstances." *Reasonable*, Black's Law Dictionary (11th ed. 2019); *see also Reasonable*, Oxford English Dictionary (3d ed. 2014) ("Within the

---

[2] There are, of course, exceptions in specific contexts. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, ___ F.4th ___, 2021 WL 3854761, at *7-15 (2d Cir. Aug. 30, 2021), in which we held, in the context of avoidance of fraudulent transfers under the Bankruptcy Code, that a transferee does not act "in good faith" when on "inquiry notice" that the transferor is engaged in fraudulent activity. That context is far removed from those in which "good faith" behavior is contrasted with objectively "reasonable" behavior; the concept of "inquiry notice" has no bearing on Ziparo's actions. Even in the bankruptcy context, we carefully distinguish good faith from a "purely objective" standard, such as "negligence" (a standard that assesses the reasonableness of a defendant's behavior), by emphasizing that the standard applied is in significant respects a subjective one. *Id*. at *11.

limits of what would it be rational or sensible to expect . . . not irrational, absurd, or ridiculous."). That is an objective standard, unconcerned with the actor's motivations or the sincerity of her beliefs. Accordingly, one may hold a belief or undertake an act in good faith, even if that belief or act is objectively unreasonable. That distinction is not a novel one; courts and legislatures routinely distinguish between good faith and reasonableness in a broad array of contexts.[3]

---

[3] *See, e.g.*, *Cheek v. United States*, 498 U.S. 192, 203 (1991) (holding, in tax prosecution, that "a claimed good-faith belief [need not] be objectively reasonable [for it] to be considered as possibly negating the Government's evidence"); *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (noting, in case under National Childhood Vaccine Injury Act, that "good faith and reasonable basis are two distinct facets. And only good faith is subjective; reasonable basis is objective.") (internal citations and quotation marks omitted); *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 111 (1st Cir. 2015) (observing, in Title VII retaliation claim, that "[u]nlike the reasonableness requirement, when assessing a plaintiff's good faith a factfinder need only ask whether a plaintiff had a subjective, honestly held belief"); *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 857 (11th Cir. 2010) ("A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented.") (emphases in original); *People v. Hernandez*, 61 Cal. 2d 529, 530 (1964) (holding it reversible error to preclude defendant in statutory rape case from introducing evidence "that he had in good faith a reasonable belief that the [victim] was 18 years or more of age"); 720 Ill. Comp. Stat. 5/9-2(a)(2) (defining second-degree murder as first-degree murder committed under circumstances in which actor subjectively "believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in

The ordinary meaning of the plain text of § 20109(b)(1)(A), then, would entail that there is no requirement that, in order to be protected, a report must be *reasonably* believed to concern a safety condition, so long as it is made in the good-faith belief that it does. The district court, however, ruled that Ziparo could not show that he engaged in protected activity "unless it was both subjectively and objectively reasonable for [him] to have believed that [the subject of his report] constituted a 'hazardous safety or security condition.'" *Ziparo*, 443 F. Supp. 3d at 297. That was error.

To be sure, the district court was not the first court to interpret § 20109(b)(1)(A) to contain an objective reasonableness element. Indeed, as CSX notes, every district court in this circuit to examine that provision of the FRSA has reached the same conclusion, *see, e.g.*, *Caria v. Metro-North Commuter R.R.*, 457 F. Supp. 3d 301, 309-10 (S.D.N.Y. 2020); *March v. Metro-North R.R. Co.*, 369 F. Supp. 3d 525, 532-33 (S.D.N.Y. 2019), as have some district courts in other circuits, *see, e.g.*, *Head v. Norfolk S. Ry. Co.*, No. 15-cv-2118, 2017 WL 4030580, at *14 (N.D. Ala. Sept. 13, 2017); *Koziara v. BNSF Ry. Co.*, No. 13-cv-834, 2015 WL 137272, at *6 (W.D. Wisc. Jan. 9, 2015).

───────────────

Article 7 of this Code, but his or her belief is unreasonable").

14

But those decisions all share a common analytical flaw. Specifically, in concluding that "good faith" as used in § 20109(b)(1)(A) contains an objective reasonableness element, the district courts have relied on various appellate decisions interpreting *other* whistleblower statutes that include specific language, absent from § 20109(b)(1)(A), that requires objective reasonableness.

In *Nielsen v. AECOM Technology Corporation*, for example, on which the court in *March v. Metro-North* expressly relied, we held that a plaintiff pleading retaliation under the whistleblower protection provision of the Sarbanes-Oxley Act, codified at 18 U.S.C. § 1514A, "must show not only that he believed that the conduct [complained of] constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation." *Nielsen*, 762 F.3d at 221 (internal quotation marks and citation omitted). That conclusion, however, was firmly grounded in the text of § 1514A, which protects employees who report conduct that "the employee *reasonably* believes constitutes a violation" of certain federal laws or regulations. 18 U.S.C. § 1514A(a)(1) (emphasis added). Similarly, the district court here relied in part on our decision in *Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019), in which we held that the framework governing § 1514A claims, including the objective reasonableness

15

requirement explained in *Nielsen*, applied to claims under the Consumer Product
Safety Improvement Act's whistleblower provision, codified at 15 U.S.C. § 2087.
We did so, however, because "[c]rucially . . . both statutes contain the
requirement that the whistleblower 'reasonably believes' there is a violation."
*Lenzi*, 944 F.3d at 114.

As already discussed, however, § 20109(b)(1)(A) does *not* contain any such
language of reasonable belief. And while CSX points to the various district court
decisions construing the statute nonetheless to contain such a requirement in
urging us to impose one, it offers no compelling reason why we should interpret
the statute to contain that requirement. Nor can we identify one. To the contrary,
we discern compelling reasons to reject that interpretation.

As an initial matter, § 20109(b)(1)(A)'s omission of reasonable belief
language stands in contrast to the inclusion of such language not only in the
other federal whistleblower statutes referenced by district courts finding a
reasonableness requirement in § 20109(b)(1)(A), but also in other provisions of
the FRSA, including other provisions of § 20109 itself. For example,
§§ 20109(b)(1)(B) and (b)(1)(C) protect an employee's refusal to work or authorize
the use of equipment based on the existence of a hazardous safety or security

16

condition, but only if "a *reasonable* individual in the circumstances then confronting the employee would conclude that . . . the hazardous condition presents an imminent danger of death or serious injury" and that the urgency of the situation requires such a refusal. 49 U.S.C. § 20109(b)(2)(B) (emphasis added).[4] Similarly, § 20109(a)(1), enacted at the same time as § 20109(b)(1)(A),[5] protects an employee who "lawful[ly] [and] [in] good faith" reports "any conduct which the employee *reasonably* believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security." 49 U.S.C. § 20109(a)(1) (emphasis added). Had Congress intended to include an objective reasonableness requirement in § 20109(b)(1)(A), it knew how to do so. But it did not include that requirement.

It is well established that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally." *Russello v. United States*,

---

[4] We recently interpreted that provision of the FRSA and concluded, consistent with its text, that it required an employee's refusal to be based on objectively reasonable grounds. *See Tompkins*, 983 F. 3d at 78-79.

[5] *Compare* Pub. L. No. 103-272, § 1(e), 108 Stat. 745, 867 (1994), *with* Pub. L. No. 110-53, Title XV, § 1521, 121 Stat. 266, 444 (2007).

464 U.S. 16, 23 (1983) (citation omitted). To hold that § 20109(b)(1)(A) requires that an employee's report be objectively reasonable in order to be protected would violate that principle by declining to give any effect to the conspicuous omission of reasonable belief language from that provision. Further, §§ 20109(a)(1), 20109(b)(1)(B), and 20109(b)(1)(C) explicitly require *both* good faith *and* objective reasonableness, and "[i]t would be unwarranted to construe 'good faith' in [§ 20109(b)(1)(A)] to have a meaning different from the same phrase in [§§ 20109(a)(1), 20109(b)(1)(B), and 20109(b)(1)(C)]." *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 93 (2d Cir. 1953) (rejecting argument that "good faith" as used in 29 U.S.C. § 258 should be interpreted to include an objective reasonableness element).

Moreover, interpreting § 20109(b)(1)(A) to require only subjective good faith is consistent with the FRSA's stated purpose: "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. In enacting § 20109(b)(1)(A), Congress sought "to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers." H.R. Conf. Rep. No. 110-259, at 348 (2007). According protection to reports made in good faith, without regard to objective

18

reasonableness, would be consistent with that statutory purpose.[6]

Finally, interpreting "good faith" to require only subjective belief is consistent with the overall structure of § 20109(b), the full text of which is set forth in the margin for ease of reference.[7] Section 20109(b)(1) creates three

---

[6] Notably, the broad protection for good-faith reports is extended only where the employee reports a hazardous safety or security condition; the protection extended in § 20109(a)(1) to whistleblowers who provide information about broader categories of purported regulatory violations not creating such hazards applies only where the employee *reasonably* believes that the violation exists.

[7] Section 20109(b) provides as follows:

(b) Hazardous safety or security conditions.--
(1) A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for--
    (A) reporting, in good faith, a hazardous safety or security condition;
    (B) refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties, if the conditions described in paragraph (2) exist; or
    (C) refusing to authorize the use of any safety-related equipment, track, or structures, if the employee is responsible for the inspection or repair of the equipment, track, or structures, when the employee believes that the equipment, track, or structures are in a hazardous safety or security condition, if the conditions described in paragraph (2) exist.
(2) A refusal is protected under paragraph (1)(B) and (C) if--
    (A) the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;
    (B) a reasonable individual in the circumstances then confronting the

19

different types of protected activities: § 20109(b)(1)(A) protects employees who

*report* hazardous safety or security conditions; § 20109(b)(1)(B) protects

employees who *refuse to work* when confronted by such a hazardous condition;

and § 20109(b)(1)(C) protects employees responsible for inspecting or repairing

certain railroad equipment who *refuse to authorize the use of such equipment* when

they believe that the equipment is in a hazardous condition.

The conditions under which those categories of employees are protected,

however, are different, and are made more restrictive as the burden imposed on

the railroad by their actions escalates. Employees who simply *report* a hazardous

condition are protected against retaliation by § 20109(b)(1)(A) on the sole

---

employee would conclude that--
    (i) the hazardous condition presents an imminent danger of
    death or serious injury; and
    (ii) the urgency of the situation does not allow sufficient time
    to eliminate the danger without such refusal; and
(C) the employee, where possible, has notified the railroad carrier of
the existence of the hazardous condition and the intention not to
perform further work, or not to authorize the use of the hazardous
equipment, track, or structures, unless the condition is corrected
immediately or the equipment, track, or structures are repaired
properly or replaced.
(3) In this subsection, only paragraph (1)(A) shall apply to security
personnel employed by a railroad carrier to protect individuals and
property transported by railroad.

condition that they make their report "in good faith." Employees who take the

more dramatic and burdensome steps of refusing to work or refusing to

authorize the use of equipment when they believe that doing so would create a

hazardous condition are subject to additional requirements, which are spelled

out in § 20109(b)(2). Those employees too must act "in good faith," 49 U.S.C.

§ 20109(b)(2)(A), but their belief must also be one that would be held by "a

*reasonable* individual in the circumstances then confronting the employee," *id*.

§ 20109(b)(2)(B).[8]

    This broader context helps to explain why Congress would subject some

actions by employees, but not others, to an objective reasonableness requirement

in order to be protected. A refusal to work or to authorize the use of equipment

imposes a substantial burden on a railroad. In contrast, a mere report of a

---

[8] That is not the only additional requirement: Employees refusing to work or inspectors refusing to authorize the use of equipment are protected only if there is no reasonable alternative to their refusal, § 20109(b)(2)(A); *see also* § 20109(b)(2)(B)(ii) (requiring sufficient urgency that refusal is necessary); if the condition in question is not merely a "hazardous safety or security condition" but is one that "presents an immediate danger of death or serious injury," § 20109(b)(2)(B)(i); and if the employee has, where possible, given advance notice to the railroad of her refusal unless the condition is promptly corrected, § 20109(b)(2)(C). None of these conditions are imposed on employees who merely report the existence of what they believe in good faith to be a hazardous safety or security condition.

putative safety violation to the railroad itself, even if mistaken, imposes no
meaningful costs on the railroad. Nor does the protection extended to an
employee making such a report impose unreasonable burdens or costs: The FRSA
does not require the railroad to take remedial action on the basis of the
employee's report, or even to investigate the reported condition. If the railroad
concludes that the report does not really create a safety or security concern, it
remains free to dismiss the report entirely. To avoid liability, it need only refrain
from punishing the employee making the report.

Nor are we persuaded that reading the statute as Congress wrote it creates
absurd or intolerable results. The FRSA does not permit incompetent workers to
hide behind a report that they later seek to characterize as involving safety. The
statute does not protect from discipline every worker who has previously made,
even in good faith, a report of a purported safety violation, or preclude any
consideration of the reasonableness of the report. Rather, it prohibits the railroad
from disciplining a worker "for" reporting such a condition. 49 U.S.C. § 20109(b).
In other words, the statute requires a disciplined employee to prove "more than a
temporal connection between the protected conduct and the adverse employment
action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014) (internal

22

quotation marks and citation omitted). "[D]iscriminatory animus, which . . .

necessarily includes some proof of retaliatory motive," must be at least a

contributing factor motivating the disciplinary action. *Tompkins*, 983 F.3d at 82.

The less rational the plaintiff's belief that a given condition presents a safety

hazard, the more difficult it will be to make out that element unless the employee

specifically expresses her concern in terms of safety.[9]

Moreover, "good faith" requires that the employee actually believe that the

facts she is reporting are true and do indeed constitute a hazardous safety or

security condition, and that the employee did not make the report for an

improper purpose. *Cf. Good Faith*, Black's Law Dictionary (11th ed. 2019) ("A state

of mind consisting in (1) honesty in belief or purpose . . . ."). Since factfinders

have no direct access to the subjective motivations of parties, good faith, like

other states of mind, must often be determined through circumstantial evidence,

and the unreasonableness of a purported belief can support an inference by a

factfinder that the employee did not in fact hold that belief in good faith. Such

matters, however, raise questions of fact; we hold not that the unreasonableness

---

[9] And, of course, it remains open to the employer to argue that the discipline was
administered not for the prohibited reason, but for some other, legitimate reason.
As noted below, CSX has proffered such a reason in this case.

of a belief is irrelevant, but only that a plaintiff is not required by § 20109(b)(1)(A) to plead or prove reasonableness as an independent element of her claim.

Accordingly, we hold that a railroad employee engages in protected activity under § 20109(b)(1)(A) when she reports what she subjectively believes to be a hazardous safety or security condition irrespective of whether that understanding is objectively reasonable.

## II.    "A Hazardous Safety or Security Condition"

We next turn to the question of what an employee must report in good faith to be protected under § 20109(b)(1)(A). The words "hazardous safety or security condition" are undefined in the statute, and we therefore accord them their ordinary meaning. *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Because those words are words of common usage, we are confident that judges and juries can determine whether a condition meets that standard based on the particular facts of the cases before them while taking the FRSA's remedial purpose into account. We thus have no need to define the term further or address comprehensively the kinds of situations that do and do not qualify.

We cannot, however, endorse the district court's particular formulation in this case, which imposes a non-textual, categorical restriction on the kinds of

24

conditions that come within the protection of the statute. After surveying the case law, the district court concluded that "[h]azardous safety or security conditions have generally been found to be *physical* conditions that are within the control of the rail carrier" and, applying that definition, held that Ziparo's reports did not fall within the statute's scope. *Ziparo*, 443 F. Supp. 3d at 297 (emphasis added) (internal quotation marks omitted). But the word "physical" appears nowhere in § 20109(b)(1)(A), nor does the overall structure of the statute imply that it was meant to cover only reports of physical conditions.

Without question, limiting the FRSA's protection to reports of physical conditions would unduly limit its scope and beget results that Congress surely did not intend. It is plain that various practices that do not involve physical conditions can create safety hazards. For example, under the district court's formulation, an employee who reports that her supervisor fails to perform required safety checks, or performs them under the influence of drugs or alcohol, would be left unprotected even though she is clearly reporting a safety hazard and exposing herself to the possibility (or even likelihood) of retaliation by her supervisor. Likewise, the district court's rule would not protect an employee who reports that a colleague is operating heavy machinery without appropriate

25

training, as was the case in *Worcester v. Springfield Terminal Railway Company*,
despite the fact that, as the *Worcester* court sensibly observed, "[a]n employee
taking on a task he cannot safely complete could constitute a 'hazardous safety
. . . condition.'" No. 12-cv-328, 2014 WL 1321114, at *4 (D. Me. Mar. 31, 2014)
(omission in original). Similarly, a critical employee's stress or fatigue can create
dangers; that is why safety regulations limit the numbers of hours or lengths of
shifts that can be worked by such workers as airline pilots, truck drivers, or,
indeed, railroad engineers. *See* 14 C.F.R. § 135.265 (airline pilots); 49 C.F.R. § 395.3
(commercial truck drivers); 49 U.S.C. § 21103 (railroad employees).

Of course, this does not mean that the term "hazardous safety or security
condition" has no limitations whatsoever. For example, although the text of
§ 20109(b)(1)(A) does not expressly limit its reach to hazardous safety or security
conditions involving the operation of the railroad, we agree with the Third
Circuit that such a limitation is implied from the FRSA's purpose and structure.
*See Port Auth. Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 166 (3d
Cir. 2015) ("[W]e think that subsection (b)(1)(A) must be read as having at least
some work-related limitation, even though no such limitation appears on the face
of the statute."). It likewise accords with the FRSA's purpose to interpret

§ 20109(b)(1)(A) as embracing only conditions that are within the control of the railroad to remedy; on that basis, a district court has concluded that an employee could not claim its protections after reporting that his "non-work-related sleep apnea . . . made him too tired to safely perform his work." *Jones v. BNSF Ry. Co.*, No. 18-cv-146, 2020 WL 2062180, at \*6-7 (D. Mont. Apr. 29, 2020). Such limitations, however, are not at issue here.

In sum, § 20109(b)(1)(A) protects an employee reporting what she sincerely believes constitutes a hazardous safety or security condition, regardless of whether the railroad or a similarly situated employee would reach the same conclusion or whether the report relates to physical conditions or to employment practices that create safety or security hazards.

## III.  Ziparo's Complaints

Having clarified § 20109(b)(1)(A)'s scope, we must next determine whether a reasonable jury could find that Ziparo engaged in protected activity. Drawing all inferences in Ziparo's favor, we hold that a reasonable jury could so find.

At the outset, we observe that Ziparo's brief makes a lengthy argument that falsifying OBWO records could have catastrophic consequences, analogizing the situation to an air traffic controller being asked to falsify the location of

27

planes in the sky. That contention, however, has no basis in the record; no other employee testified that the OBWO itself has any safety-related purpose or that CSX uses the OBWO to monitor the physical location of train cars.[10] Nor, for that matter, could a reasonable jury conclude from the record evidence that Ziparo subjectively understood at the time that he made his reports that the falsification of OBWO information itself has safety implications of that nature; Ziparo did not voice such concerns at the time he made his reports, nor did he testify that such concerns motivated his complaints.[11]

_____

[10] As explained above, there is some evidence that railroad employees can use the OBWO as a means of *obtaining* documentation useful to first responders. *See* J. App'x at 226, 893-94. But there is no evidence that employees *enter* information on the OBWO itself to track train locations in a manner analogous to air traffic control.

[11] Ziparo argues that the district court erred in granting summary judgment on the question of whether he subjectively considered the falsified OBWO entries themselves to create a safety hazard at the time of his reports because "summary judgment is generally inappropriate where questions of intent and state of mind are implicated." *Gelb v. Bd. of Elections of City of New York*, 224 F.3d 149, 157 (2d Cir. 2000). But Ziparo cannot point to a single piece of evidence in the record indicating that he saw the falsified entries – rather than the environment that Van Blarcom's and Lacy's demands created – as a safety hazard at that time. "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), and we cannot say on the record before us that the district court erred in rejecting this particular theory of subjective belief at the summary judgment stage.

However, it is likewise clear from the record that a reasonable jury *could* conclude that Ziparo believed that Lacy's and Van Blarcom's demands were creating an unsafe environment by causing Ziparo (and at least one other employee, Pigula) to be stressed and distracted and therefore unable to focus properly on their work. Ziparo testified that his superiors' constant demands left him unable to focus on his work and that communication between him and Pigula deteriorated significantly as a result, a characterization with which Pigula agreed. Ziparo and Pigula both testified that they repeatedly told Lacy and Van Blarcom that their demands were creating an unsafe environment and that, as Ziparo put it, "[s]omething [was] going to happen." J. App'x at 567. Moreover, Ziparo repeated that precise concern to CSX's ethics hotline when he lodged a formal complaint against Lacy and Van Blarcom, explaining that their demands created "a safety issue because employees are not focused on their work." J. App'x at 898.

Contrary to the district court, we hold that complaints of stressful and distracting work conditions like Ziparo's may well fall within the scope of "hazardous safety or security condition[s]" under § 20109(b)(1)(A). That is not to say that any railroad employee who tells her employer that she feels unable to

29

perform her work safely due to stress and distraction is protected under the statute; for example, an employee whose stress or distraction results from a turbulent personal life enjoys no protection from termination. But a jury, taking the facts in the light most favorable to the plaintiff, could find that is not what happened here. Ziparo complained about what he believed to be an unsafe environment caused by the improper conduct of CSX's employees, which was well within CSX's power to control. Indeed, there is evidence in the record that, after investigating Ziparo's report, CSX put an end to the practices of which he complained. It is clearly for the factfinder at trial to determine whether Ziparo believed in good faith, as he has consistently asserted, that those practices were creating a genuine safety hazard. Section 20109(b)(1)(A) requires no more.

Finally, we decline CSX's invitation to affirm the district court's judgment on the alternate basis that no reasonable jury could find that Ziparo was fired in part for his reports about Lacy and Van Blarcom rather than solely because of his negligence in failing to properly reset a switch. *See Tompkins*, 983 F.3d at 82-83 (discussing factors relevant to assessing whether a plaintiff has sufficiently established a causal relationship between the protected activity and a disciplinary action). Although CSX advanced that argument below, the district court did not

30

reach it, and we decline to do so for the first time on appeal. The district court, of course, remains free to consider that issue on remand.

## CONCLUSION

For the reasons stated above, the judgment of the district court is VACATED and the case is REMANDED for further proceedings.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit